**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　　v.

BRENT ROGER WILKES,
　　　　　　*Defendant-Appellant.*

No. 08-50063

D.C. No.
07-cr-00330-LAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
August 29, 2011—Pasadena, California

Filed October 19, 2011

Before: Arthur L. Alarcón, Diarmuid F. O'Scannlain, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Alarcón

**COUNSEL**

Reuben C. Cahn, Shereen J. Charlick (argued) and Gabriel L. Cohan, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter, Jason Forge (argued), Valerie H. Chu and Phillip L. B. Halpern, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

---

**OPINION**

ALARCÓN, Senior Circuit Judge:

Brent Wilkes appeals his convictions on multiple counts of conspiracy, honest services wire fraud, bribery, and money laundering. This case centered around the political corruption of former California Congressman Randall "Duke" Cunningham, who provided lucrative government defense contracts to Wilkes and others in exchange for expensive meals, lavish trips, a houseboat in Washington, D.C., and mortgage payments for his multi-million dollar home in San Diego County. Wilkes appeals his convictions.

**I**

Brent Wilkes, a San Diego native, worked as an accountant in the early 1990s. In 1993, he became a lobbyist for Audre Co., a San Diego based software company. As Audre's lobbyist, Wilkes met with members of Congress to sell Audre's document conversion system to government agencies. Wilkes left Audre in 1994. In 1995, Wilkes drafted a congressional proposal for a government-funded program to convert documents into electronic format, which he named Automated Data Conversion Systems ("ADCS Program"). Wilkes then

started his own company named after that program, ADCS, Inc. ("ADCS"). In May 1995, Wilkes hired his nephew, Joel Combs, to work as a software person for ADCS. Wilkes later hired a consultant, Mitchell Wade, to assist ADCS in obtaining government contracts. Michael Williams was also hired as vice president of operations for ADCS.

From ADCS's inception, Wilkes traveled from San Diego to Washington, D.C. to meet with Congressmen Cunningham and Duncan Hunter to secure the appropriation of federal funding for the ADCS Program. In 1997, Cunningham was appointed to the House Appropriations Committee, which had the power to add money (i.e. earmarks) to the President's budget. To solicit his support for ADCS's programs, Wilkes expended tens of thousands of dollars on meals for Cunningham, treated the Congressman to trips, and devised a plan to give Cunningham over $100,000 disguised as payments for Wilkes's purchase of the "Kelly C," the houseboat on which Cunningham lived while in Washington, D.C. In return for the benefits he gave Cunningham, Wilkes received government contracts worth millions of dollars through Cunningham's earmarks.

In 1998, with Cunningham's support, ADCS received a government contract to scan documents in Panama for the Department of Defense ("DOD"). Wilkes regularly billed the government for poor work, work never done, and equipment he supposedly bought for the government. When government officials expressed their concerns about ADCS, Wilkes used Cunningham's influence to pressure them to continue to fund contracts for the company.

In 2000, Wilkes and Cunningham began seeking government funding through another document scanning and conversion program called the Global Infrastructure Data Capture Program ("GIDC"). When the DOD decided to redirect millions of dollars from Wilkes's scanning project to another use, Wade, acting on Wilkes's behalf, threatened to have a DOD

official fired. Cunningham intervened, and government officials caved in to his pressure by diverting to Wilkes millions of dollars from counter-terrorism funds.

In 2001, Wilkes and Wade shifted their focus from contracts for document conversion to contracts to supply equipment and software for the Office of the Secretary of Defense ("OSD"). Wade testified that, with Cunningham's support, he and Wilkes marked up — by as much as 600% — the price of off-the-shelf equipment they sold to the government. Despite the high profit margins on the supply contracts, Wilkes and Wade failed to deliver the equipment that was requested by the government.

By 2001, Wade also began building his own relationship with Cunningham and made various secret payoffs to the Congressman. In 2003, Wade had managed to insert his own company, MZM, Inc., in place of ADCS, as the prime contractor for the OSD contract. Cunningham made additional appropriations requests for MZM, Inc.

In August 2003, seeing that Wade's earmarks were getting bigger, Wilkes treated Cunningham to a lavish Hawaiian vacation filled with a variety of diversions including fine dining, scuba diving, and evenings with prostitutes. In return, Cunningham earmarked $16 million for Wilkes and Wade as part of the GIDC program the following month and listed GIDC as one of his two top priorities in 2004.

In 2004, Cunningham was responsible for securing millions of dollars in appropriations for Wilkes's and Wade's benefit. In exchange, Wade paid off a first mortgage in Cunningham's residence in the amount of $500,000 and, through a complicated series of financial transactions among multiple companies, Wilkes paid off $525,000 on Cunningham's second mortgage.

In 2005, the San Diego Union-Tribune published an article exposing Wade's bribery scheme. Wade began cooperating

with prosecutors. In August 2005, ADCS's offices were searched, and Wilkes's business records and computers were seized.

On February 13, 2007, a federal grand jury returned a 25-count Indictment against Wilkes. On May 10, 2007, a federal grand jury returned a 25-count Superseding Indictment against Wilkes. Wilkes's jury trial commenced on October 3, 2007. At trial, Wilkes requested immunity for defense witness Michael Williams, who he contended would offer testimony that contradicted the testimony of several immunized prosecution witnesses. The district court denied Wilkes's request based on its conclusion that it could not compel a defense witness's immunity absent a finding of prosecutorial misconduct.

On November 5, 2007, after four days of deliberation, the jury found Wilkes guilty on thirteen counts: one count of conspiracy (18 U.S.C. § 371), ten counts of honest services wire fraud (18 U.S.C. §§ 1343 and 1346 ), one count of bribery of a public official (18 U.S.C. § 201), and one count of money laundering (18 U.S.C. § 1956(a)(1)(B)(i)). After the district court discharged the jury, it imposed criminal forfeiture against Wilkes in the amount of $636,116. The district court also imposed a fine against Wilkes in the amount of $500,000.

The district court issued its written judgment on February 19, 2008. Wilkes timely filed his notice of appeal on February 19, 2008. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction to review the district court's final judgment pursuant to 28 U.S.C. § 1291.

## II

Wilkes challenges his convictions on multiple grounds. First, he argues that his Fifth and Sixth Amendment rights were violated when the district court declined to compel use immunity for defense witness Michael Williams. Having reviewed this issue de novo, we remand in part for an eviden-

tiary hearing regarding whether the district court should have granted Williams use immunity pursuant to *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008), a case decided by this court after the district court declined to grant use immunity to Williams.

Wilkes also argues on appeal that his Fifth and Sixth Amendment rights were violated: (1) when prosecutors failed to comply with the mandates of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972); (2) when prosecutors committed misconduct by engaging in improper closing arguments; and, (3) when the district court refused to grant Wilkes's request to continue the trial to allow time for him to prepare. Wilkes further contends that there was insufficient evidence of honest services fraud, bribery, and money laundering to support his convictions, and that the jury was misinstructed on those offenses. He also maintains that the recent holding in *Skilling v. United States*, 130 S. Ct. 2896 (2010) compels reversal on all counts because the prosecution relied on multiple honest services fraud theories, including the conflict-of-interest/undisclosed self-dealing theory later invalidated in *Skilling*. Finally, Wilkes asserts that the criminal forfeiture judgment violates the Sixth Amendment since the jury did not return a verdict on that charge. We affirm because we conclude the district court did not commit reversible error in its rulings on these issues.

## III

### A

Wilkes argues that his Fifth and Sixth Amendment rights were violated when the district court declined to compel use immunity for defense witness Williams. "The question of whether a district court erred by refusing to compel use immunity is a mixed question of law and fact that we review *de novo*. Factual findings underlying the district court's ruling are reviewed for clear error." *Straub*, 538 F.3d at 1156 (citing

*United States v. Alvarez*, 358 F.3d 1194, 1216 (9th Cir. 2004)).

Wilkes maintains that the district court should have compelled the prosecution to grant use immunity to defense witness Williams because had he been granted immunity, his testimony would have corroborated Wilkes's testimony and directly contradicted the testimony of immunized government witnesses. The government contends that Wilkes was not entitled to compelled use immunity for Williams because Wilkes failed to provide a valid offer of proof of Williams's testimony in the presence of the witness's counsel and counsel for the government. Wilkes's ex parte proffer to the district court was thus meaningless, the government argues, because there was no reason to believe Williams would have testified as Wilkes proffered.

At trial, the district court concluded that Wilkes had demonstrated Williams would invoke his Fifth Amendment privilege if called to testify, and that the exercise of that privilege would be valid. Over the objection of the government, the district court allowed the defense to make a proffer as to Williams's testimony at an ex parte sidebar conference. The transcript of the proffer was filed under seal. The government did not have access to defense counsel's proffer to the district court until we granted its motion to have those portions of the record unsealed just prior to oral argument in this appeal. The transcript of the sidebar conference indicates that Williams would testify that:

> in 1998 he began working with ADCS as part of his employment. He began managing and overseeing all major projects, especially and including the Panama project. He oversaw all the work. There was real work being performed. He would testify about adverse conditions that work was being done [sic], the timetable and the fact that the employees were working long hours. He would testify about the

equipment that Mr. Wilkes purchased on his own and brought to Panama. The dispute about the barcoding of the equipment and he would . . . also [be] greatly important to the relationship between the prime [contractor] . . . to that which was MCSI . . . He can speak to Joel Combs and what Combs did or didn't do, even though Mr. Combs readily admits he is a ball dropper. . . . [G]iven the proper context, Mr. Williams can explain this gentleman's intent to go off on his own which is going to be central to [the] defense.

ER 3678.

The district court concluded that "[g]iven the proffer of [Wilkes's counsel] at sidebar, I find that Mr. Williams would have admissible relevant testimony to offer. It would not be cumulative. And given the proffer, as I said, it would be exculpatory." ER 2477-79. The district court stated:

I have to tell you the proffer I have as to what this fellow can offer strikes me as material and relevant evidence that the defense would want to present to counter some of what's been presented by the United States through immunized witnesses.

. . . .

The court, having fully heard all counsel, denies the motion to convey use immunity. Here, as I said, unless it's somehow tethered to the suggestion of prosecutorial misconduct, I don't think it's appropriate for the court to make determinations of who gets immunity and who doesn't.

In the first instance, under our system of Government, that's a prosecutorial decision. And unless I can find that the way in which discretion was exer-

cised was unfair so as to deny the defendant a due process right, then it's not appropriate for me to substitute my judgment for that of the prosecutor. I do have a concern about the effect of not granting immunity in this case, but I would have the same concern if it was a different privilege implicated over which I'd have no authority to pierce the privilege and order a witness to testify, any number of other privileges. So it's an effect that the criminal justice system lives with and accommodates. And that alone, contrary to a broad reading of *Westerdahl*, is not sufficient to authorize me to exercise authority to grant use immunity pursuant to 18 U.S.C. § 6003.

ER 2480-94.

**B**

**[1]** After Wilkes was convicted, this court clarified the two-part test by which the defendant may seek to compel the prosecutor to grant use immunity as a matter of due process. In *Straub*, we held that a district court *can* compel a defense witness's immunity absent a finding of prosecutorial misconduct, where "in exceptional cases, the fact-finding process may be so distorted through the prosecution's decisions to grant immunity to its own witness while denying immunity to a witness with directly contradictory testimony that the defendant's due process right to a fair trial is violated." *Straub*, 538 F.3d at 1166. Under the clarified test, the defendant must first show that the defense witness's testimony was relevant. *Id.* at 1157. Second, the defendant must show either that

> (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a

> defense witness whose testimony would have
> directly contradicted that of the government witness,
> with the effect of so distorting the fact-finding pro-
> cess that the defendant was denied his due process
> right to a fundamentally fair trial.

*Id*. at 1162. The "relevance requirement is minimal, . . . . [and
t]he defendant need not show that the testimony sought was
either clearly exculpatory or essential to the defense." *Id.* at
1163 (internal quotation marks and citations omitted). More-
over, the "test requires only that the proffered defense testi-
mony directly contradict[s] the government witness's
testimony on a relevant issue, not that the testimony would
have compelled the jury to exonerate the defendant." *Id.*
"[T]estimony satisfies the test for 'directly contradictory'
[where] the testimony, if believed by the jury, could have sup-
ported a finding that the testimony directly contradicted that
of the government's witness." *Id.*

Here, the district court concluded that Wilkes had proffered
testimony by Williams that would have been "material and
relevant evidence that the defense would want to present to
counter some of what's been presented by the United States
through immunized witnesses." The district court also repeat-
edly expressed its concern that not granting Williams immu-
nity would have the effect of distorting the fact-finding
process. The court nonetheless refused to compel use immu-
nity because it concluded that it was powerless to do so absent
a finding of prosecutorial misconduct.

The government argues on appeal that there was no distor-
tion of the fact-finding process because Williams's testimony
would not directly contradict the testimony of immunized
government witnesses. Thus, the government maintains, "the
refusal to immunize Williams did not distort the fact-finding
process in any away whatsoever, let alone to such an extent
as to deny Wilkes a fundamentally fair trial." The district
court concluded, however, that the proffered testimony would

"counter" the testimony presented by the prosecution through immunized government witnesses, and the government did not challenge that finding as clearly erroneous.

**[2]** In view of this court's ruling in *Straub* that a finding of prosecutorial misconduct is not required to compel use immunity, this matter must be remanded to the district court for an evidentiary hearing so the trial court can gather "greater detail about [Williams's] proposed testimony and the immunity agreements the government gave to its other witnesses" to determine whether compelled use immunity was constitutionally required. *Straub*, 538 F.3d at 1151 (internal quotation marks omitted).

## IV

Wilkes argues that his Fifth and Sixth Amendment rights were violated when prosecutors failed to disclose evidence about cooperating witnesses as required under the holdings of *Brady*, 373 U.S. 83 and *Giglio*, 405 U.S. 150. He also argues that prosecutors committed misconduct by unlawfully disclosing grand jury information before the commencement of the trial. Wilkes further contends that the prosecution committed misconduct by making improper arguments in summation. Alleged *Brady* and *Giglio* violations are reviewed de novo. *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004). Prosecutorial misconduct is reviewed for plain error where, as here, a defendant fails to object at trial. *United States v. Moreland*, 622 F.3d 1147, 1158 (9th Cir. 2010) (citing Fed. R. Crim. P. 52(b)).

## A

**[3]** "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Suppressed evidence must be

considered collectively, not item by item, and is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Hein v. Sullivan*, 601 F.3d 897, 906 (9th Cir. 2010) (internal quotation marks and citations omitted). "There is a reasonable probability of prejudice when suppression of evidence undermines confidence in the outcome of the trial." *United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) (internal quotation marks and citations omitted).

"There are three elements of a *Brady/Giglio* violation: '(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.' " *Id.* at 901 (quoting *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008)) (internal quotation marks omitted); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Wilkes has not established any violations under *Brady* or *Giglio* because he has not shown prejudice. The evidence about cooperating witnesses that Wilkes alleges was improperly withheld did not contain any new impeachment information and would therefore be unlikely to have altered the verdict. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154.

**1**

At trial, the prosecution explained that the decision to grant Combs immunity was the result of "months of decision-making" based on proffers. ER 2484. The proffer sessions, however, were not provided to the defense. Wilkes contends that "*Giglio v. United States*, 405 U.S. 150 (1972) required disclosure of Combs' 'proffer' sessions, not merely his FBI interviews." Appellant Br. 55. Wilkes maintains that suppression of the proffer sessions undermined confidence in the verdict because prosecutors told jurors that Combs had no incentive to lie, "while withholding evidence casting doubt upon his credibility." Appellant Reply Br. 22-23.

**[4]** Wilkes has not cited any authority, and we have found none, holding that the government must disclose all proffers irrespective of whether the proffers contain information subject to disclosure under *Brady* or *Giglio*. While evidence that impeaches a witness's credibility falls within the *Brady* principle when the reliability of the witness "may well be determinative of guilt or innocence," *Giglio*, 405 U.S. at 154, Wilkes has failed to establish that the disclosure of the proffer sessions would have served to impeach Combs's credibility. He has also not demonstrated that any impeachment value would not have been cumulative.

This court has held that evidence is material if it is "of a different character than evidence already known to the defense." *Kohring*, 637 F.3d at 904 (holding that evidence of a key witness's prior sexual misconduct was material because it "would have shed light on the magnitude of Allen's incentive to cooperate with authorities and would have revealed that he had much more at stake than was already known to the jury"). Evidence is cumulative, however, if the grounds for impeachment are " 'no secret' to the jury." *Id.* at 908. Here, the jury knew that Combs had immunity and was also aware of Combs's involvement in the Cunningham bribery scheme.

**[5]** Moreover, the government's case did not hinge on Combs's testimony. While Combs may have been a significant witness, the government presented over two-dozen other witnesses and extensive documentary evidence of Wilkes's guilt. *Compare Maxwell v. Roe*, 628 F.3d 486, 512 (9th Cir. 2010) (finding *Brady* violation where the jury's assessment of the witness's credibility was crucial to the outcome of the trial because the prosecution itself admitted that the evidence against the defendant was weak and if the jury had not believed the witness, the defendant may not have been convicted) *with Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010) (holding that there was no likelihood that the suppressed evidence, including proof of perjury, criminal activity and cooperation with the government, would have changed

the jury's verdict because it was "similar to and cumulative of the extremely thorough impeachment during [the witness's] cross-examination"). Accordingly, Wilkes has not demonstrated that there is a reasonable likelihood that the withheld information concerning Combs's proffer sessions would have changed the verdict. *See Giglio*, 405 U.S. at 154 (We do not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.") (internal quotation marks and citations omitted).

**2**

Five days after Wade testified at Wilkes's trial but before the jury reached its verdict, Wade settled his Federal Election Commission ("FEC") criminal and civil liability in a Conciliation Agreement which imposed a $1,000,000 fine upon him. Wilkes contends that the government's failure to disclose information concerning Wade's negotiation of criminal and civil liability with the FEC undermined confidence in the verdict because the withheld evidence casts doubt upon Wade's credibility. Wilkes argues that the fact that Wade agreed to pay the fine within 30 days reveals that Wade had "ready access to at least $1,000,000 which could've come from his admitted criminal activity — fertile ground for cross[-]examination denied to Wilkes." Appellant Br. 56-57.

**[6]** "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. Wilkes has failed to establish that there is a reasonable probability that information concerning Wade's negotiation of criminal and civil liability with the FEC would have altered the verdict. The jury was well aware of Wade's ill-gotten gains. Both the government and Wilkes elicited extensive testimony from Wade that he made a great deal of money from his crimes, including tens of millions in appropriations for his own bene-

fit and $20 million through the sale of his business. The jury also heard argument from the government that "Mitch Wade learned his lessons from Brent Wilkes. Did he take it to another level? You bet he did. Is he a crook? You bet he is." ER 3018. Thus, there is no reasonable likelihood that the evidence of Wade's negotiation with the FEC could have changed the jury's verdict because it was "similar to and cumulative of the extremely thorough impeachment during [Wade's] cross-examination." *See Heishman*, 621 F.3d at 1035 (A "witness may be 'so thoroughly impeached' that even evidence of perjury at trial is 'merely cumulative' ") (quoting *United States v. Polizzi*, 801 F.2d 1543, 1551 (9th Cir. 1986)).

**B**

Wilkes maintains that the prosecution's pretrial unlawful disclosure of grand jury information compromised the grand jury's independence and constituted structural error. To obtain reversal based on prosecutorial misconduct, a defendant must establish "both misconduct and prejudice." *United States v. Wright*, 625 F.3d 583, 609-10 (9th Cir. 2010). "A finding of prejudice . . . requires that the conduct have some impact on the outcome of the proceeding — i.e., a reasonable probability that the result of the proceeding would have been different or that it so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hein v. Sullivan*, 601 F.3d 897, 905 n.4 (9th Cir. 2010).

The district court found that before the February 13, 2007 indictment was issued, at least three newspaper articles were published identifying Wilkes as a target of the grand jury probe and predicting that he would be indicted. The trial judge concluded that "the public interest was at least temporarily compromised in this case by the irresponsible and illegal actions of one or more government agents who leaked secret grand jury information to news reporters," but that "Wilkes was not prejudiced by the alleged governmental mis-

conduct in this case, and that it had no material [e]ffect on the verdict." Doc. No. 171.

**[7]** As the government correctly asserts, grand jury leaks are the kind of non-structural errors that are rendered harmless by the trial jury's verdict. *See Polizzi*, 500 F.2d at 888 ("If a grand jury is prejudiced by outside sources when in fact there is insufficient evidence to indict, the greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence.") (quoting *Silverthorne v. United States*, 400 F.2d 627, 634 (9th Cir. 1968)). Wilkes does not contend, nor has he established, that the petit jury that convicted him was at all affected by information that was improperly leaked before the indictment issued. Accordingly, Wilkes has failed to demonstrate that he was prejudiced by the leaking of secret grand jury information.

## C

Wilkes contends that prosecutors committed misconduct in their summation by making false and improper arguments. He maintains that the prosecutor's argument that they did not call former Congressman Cunningham as a witness because they did not want to give him a sentence reduction was both improper and false. Wilkes also maintains that prosecutors falsely argued that its witnesses had no motives to lie and improperly shifted the burden by informing the jury that in order to find Wilkes not guilty, they had to believe his testimony. Wilkes further argues that the prosecution improperly appealed to jurors' passions and prejudices by "repeatedly urging them to 'vindicate their rights' and convict Wilkes because he used *their* money." ER 3005, 3021.

### 1

In determining whether a prosecutor's comment rendered a trial constitutionally unfair, this court considers the following factors:

whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence.

*Hein*, 601 F.3d at 912-13 (citation omitted). "[D]efense counsel's conduct, as well as the nature of the prosecutor's response, is relevant." *United States v. Young*, 470 U.S. 1, 12 (1985). "[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* at 12-13. Prosecutors and defense lawyers are given "wide latitude" in closing arguments. *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000).

**a**

In closing argument, Wilkes's counsel stated to the jury: "Why didn't [the prosecution] put Congressman Cunningham on? . . . They can say what they want. The fact that they didn't call him speaks volumes about the fact that they didn't believe him." ER 2996. In response, the government told the jury that it was "not going to put the most corrupt politician in the history of this country on the witness stand and give him a chance to get a break in his sentence." ER 3017; Appellee Br. 58. Wilkes contends that the prosecutors' remarks to the jury concerning their reasons for not calling Cunningham as a witness constitute "prejudicial misconduct [that] violated [his] due process rights." Appellant Br. 59. Wilkes argues that the remarks were improper because they did not constitute evi-

dence and prosecutors may not supply facts not in evidence as they may be given undue weight. *See*, *e.g. United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) ("A prosecutor has no business telling the jury his individual impressions of the evidence.") Wilkes further argues that the prosecutors' purported reason for not calling Cunningham — that they did not want to give Cunningham a reduction in his sentence — was false. Appellant Br. 59. Wilkes points to a letter from Cunningham, which reveals that "he was waiting at court to testify but was told the judge's rulings about the scope of rebuttal didn't permit it." Appellant Br. 59; ER 3571.

The government argues that it has never used Cunningham as a witness in any proceeding and that "Wilkes expressly invited the Government to answer why Cunningham was not called as a witness." Appellee Br. 55-56. It further maintains that "one of the reasons the Government did not call Cunningham at trial was because prosecutors did not trust him to refrain from fabricating testimony that he believed would *help* the prosecution (and thus enhance his chances for a reduced sentence)." *Id*. The government notes that, "Although years before Wilkes's trial, the Government had recommended a two-level Guidelines' reduction for Cunningham's substantial assistance, that assistance was limited to waiving protections under the Speech or Debate Clause and making consensually-recorded phone calls to Tommy Kontogiannis — i.e.[,] nothing requiring Cunningham's testimony." Appellee Br. 56 n.24.

**[8]** In *United States v. Young*, 470 U.S. 1 (1985), the Supreme Court explained that courts should examine rebuttal arguments in the context of the arguments that they rebut. The Court held that although the prosecutor's expression of personal opinion as to the defendant's guilt was improper, "any potential harm from this remark was mitigated by the jury's understanding that the prosecutor was countering defense counsel's repeated attacks on the prosecution's integrity and defense counsel's argument that the evidence established no

such crime." *Id.* at 17-18. The Court reasoned that the "overwhelming evidence [presented by the prosecution] . . . eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Government's prestige in the eyes of the jury." *Id.* at 19.

**[9]** Here, as in *Young*, Wilkes invited the government to answer why it did not call Cunningham as a witness. In addition, the government presented substantial evidence of Wilkes' conspiracy, fraud, bribery and money laundering, thereby "eliminat[ing]" any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Id*.

Wilkes cites to *United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993), which held that while the "invited response doctrine" from *Young* may excuse certain arguments that would normally be reversible error, "it can't sanitize the prosecutor's misstatements to the jury." *Id.* at 1331-32. In *Kojayan*, this court reversed the defendant's conviction based on a prosecutor's misstatement that the government was powerless to compel a witness to testify when, in fact, the witness had entered into a plea agreement with the government and had promised to testify at trial. *Id.* at 1318-19. Wilkes, however, has failed to demonstrate that the prosecutor's reasons for not calling Cunningham as a witness constituted "misstatements." While Cunningham may have offered assistance to the government, he did not testify at any trial. In addition, prosecutors offered other legitimate reasons for not calling Cunningham to the stand, including the fact that they did not think he could testify truthfully.

The district court in this case repeatedly instructed the jury that comments by counsel are not evidence. For instance, the court admonished the jury: "Remember — this should be engraved in the front of your foreheads now — things that the lawyers say are not evidence." SER 238, 239, 240, 241, 242, 243. This same admonishment was also included in the jury instructions sent into the jury room. *See Wright*, 625 F.3d at

613 (improper statements rendered harmless by court's instruction that arguments by lawyers are not evidence).

**[10]** Wilkes expressly invited the government to explain its reasons for not calling Cunningham as a witness. Accordingly, the government's statements were not improper and given the overwhelming evidence against Wilkes in this case, Wilkes has not demonstrated that these statements resulted in any prejudice.

**b**

Wilkes contends that the prosecution improperly argued that their witnesses had no motive to lie. He asserts that this argument was "clearly false in light of Combs' and Wade's criminal exposure, but also false as to the [DOD] officials and lobbyists who faced possible repercussions for interactions with Cunningham, or by signing off on certain contracts." Appellant Br. 59. Wilkes also maintains that the prosecutors "vouched for Combs' credibility, telling the jury that his immunity agreement 'obligates him to tell the truth' and querying 'why in the world, what incentive does he have to get up there and lie about his uncle? There's nothing.' " ER 3004, 3017.

**[11]** "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir. 1993). This court has found that vouching is "especially problematic in cases where the credibility of the witness is crucial." *Id.* (internal citations and quotation marks omitted). Prosecutors may, however, "argue reasonable inferences based on the evidence, including that one of the two sides is lying." *Id.* (internal citations and quotation marks omitted). Furthermore, prosecutors are permitted to respond to defense counsel's attempts to impeach the credibility of government witnesses.

*See id.* at 1278-79 (finding the prosecutor did not improperly vouch by eliciting testimony about the truthfulness provision of a witness's plea agreement because it was offered in response to defense counsel's attacks on the witness's credibility). Thus, statements made by the prosecution do not constitute improper vouching where the argument that witnesses had no motive to lie is a permissible response to the defense counsel's earlier attacks on the witnesses's credibility.

**[12]** Here, Wilkes's counsel repeatedly offered his personal opinion that witnesses for the prosecution were lying and trying to mislead the jury throughout his closing argument. For example, defense counsel argued that, in his opinion, prosecution witness Frank Collins "lied" when he testified "because Frank Collins has an ax to grind." ER 2988. Defense counsel also told the jury that in his opinion, prosecution witness Joel Combs "certainly tried to mislead you." ER 2992. Further, defense counsel stated his opinion that "one of the biggest problems in this case is that [the prosecutors] have consistently tried to mislead you," (ER 2972) by doing a "a slight of hand during this trial and during their closing argument yesterday." ER 2977.

**[13]** In rebuttal to defense counsel's summation, the prosecution asked the jury:

> Do you think, Ladies and Gentlemen, over a dozen witnesses with absolutely no dog in this fight got up on the witness stand and lied to you? Or, Ladies and Gentlemen, do you think the Defendant got up on the stand and lied to you; the Defendant, the man with more incentive, more motive to lie than all of the other witnesses combined? Of course he did. He had no choice. He was looking at a mountain of evidence.

ER 3004. The prosecutor's argument that its witnesses told the truth, rather than Wilkes, was not vouching but was "sim-

ply an inference from evidence in the record." *Necoechea*, 986 F.2d at 1279 (explaining that a prosecutor improperly vouches where he makes statements that bolster a government witness's credibility by referring to facts not in the record, such as explaining why a witness did not testify against codefendants). In direct response to defense counsel's express statements to the jury that government witnesses were lying, the prosecutor here merely argued that its witnesses were telling the truth; "an argument the prosecutor had to make in order to convict [Wilkes]." *Id.* That argument did not imply that the government had personal knowledge of or was assuring the veracity of its witnesses, and did not reflect the prosecutor's personal beliefs. *Id.*

Moreover, Wilkes has failed to establish that he suffered prejudice as a result of the alleged vouching. This was not a close case. While Combs's testimony may have significantly helped the government's case, prosecutors also presented over two-dozen other witnesses and extensive documentary evidence of Wilkes's guilt. *See Necoechea,* 986 F.2d at 1280-81 (finding that even improper vouching did not require reversal because the witness's testimony was thoroughly impeached, the jury was instructed that an attorney's statements are not evidence, and, while the witness provided the strongest direct evidence of a crucial element in the prosecution's case, there was significant circumstantial evidence that connected the defendant with the conspiracy). The government's statement in closing argument that Wade's immunity obligated him to tell the truth was information the jury had already heard when defense counsel cross-examined Wade about his immunity and Wade responded that it was "only predicated on the truth." ER 2188; *See also* ER 3019.

## c

Wilkes contends that "prosecutors improperly told jurors that in order to find Wilkes not guilty, they had to believe his testimony." Appellant Br. 60; ER 3017 ("You have to believe

that preposterous charade to believe [Wilkes is] not guilty.") Wilkes also maintains that it was impermissible for prosecutors to argue that "each [government witness], if you think about their testimony and what they told you, you either have to believe all of those people or you believe Brent Wilkes. That's the choice before you. You can't believe both." *Id*.; ER 2937.

Wilkes's argues that *United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006) supports his contention that the government engaged in improper burden-shifting. In *Perlaza*, this court reversed the defendant's convictions because the prosecution erroneously told jurors that the "*presumption* [*of innocence*] . . . *is going to vanish* when you start deliberating. And that's when the presumption of guilt is going to take over you." 439 F.3d at 1169 (emphasis added) (internal quotation marks omitted). A misstatement of the government's correct burden of persuasion is not, however, comparable to a prosecutor's statement that the jury had to believe the defendant to believe he was not guilty.

**[14]** The prosecution made the alleged improper statement after explaining at length to the jury what it had to prove in order for the jury to find Wilkes guilty. In this context, such a statement is considered to be nothing more than an "isolated moment" in a 28-day trial. *See Moreland*, 622 F.3d at 1162-63 (not improper burden-shifting where the prosecution had reviewed the legal elements of what the jury would have to find in order to convict the defendant and statement was an " 'isolated moment' in a 34-day trial") (internal citations omitted). In "a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of two sides is lying." *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991); *see also Moreland*, 622 F.3d at 1163 (finding that the prosecution did not commit misconduct when it asked jurors to assess a witness's credibility and "once you conclude they're not credible, case is over.").

**[15]** Wilkes's citation to *United States v. Stanfield*, 521 F.2d 1122 (9th Cir. 1975) is equally unpersuasive. In *Stanfield*, this court reversed because of improper statements by the trial judge where the judge undertook to make the opening statements for each side to the jury. By asking the jury, "to look as you hear the evidence for what you will think in your own mind is the *truthful version*," this court found that the judge's statements obscured the correct standard for jury consideration of evidence in a criminal case. *Id.* at 1124-25 n.1. Unlike in *Stanfield*, the statement that Wilkes challenges was made by the prosecutor at closing argument, after the evidence had been presented to the jury. Accordingly, the statement cannot be said to have obscured the correct standard for jury consideration. Wilkes has not established that the prosecutors engaged in improper burden-shifting, and has also failed to demonstrate that prejudice resulted from these statements.

### d

Wilkes argues that prosecutors "improperly appealed to jurors' passions and prejudices, repeatedly urging them to 'vindicate their own rights' and convict Wilkes because he used *their* money." ER 3021; ER 3005, 3021. The government grounded its arguments in the instructions and proof, as indicated in the following statements, which Wilkes now challenges:

> If paying prostitutes to sleep with a Congressman with whom you have business going on is not cheating us out of our rights to that Congressman's honest services, then our rights mean nothing. They're worth nothing. But, you know, ladies and gentlemen, *from the instructions*, our rights do exist. They mean something. You will vindicate those rights here.

ER 3005. Wilkes's reliance on *United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005) is inappropriate because

the statements in that case did not speak to the question of defendant's guilt, but rather "were clearly designed to encourage the jury to enter a verdict on the basis of emotion rather than fact." *Id*. at 1149-50. There, the government argued that "[c]onvicting [the defendant] is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around semiautomatic . . . ." *Id.* at 1149. Moreover, unlike in *Weatherspoon*, the government presented a strong case against Wilkes and any harm that may have resulted from the above statements was mitigated by jury instructions stating that attorney's statements are not evidence. *Cf. id*. at 1151-52 (finding that improper vouching presented a strong possibility of prejudice where the case was not particularly strong and there was no adequate curative jury instruction).

**[16]** Wilkes has failed to show that the government improperly appealed to juror's passions and prejudices. In light of the government's strong case against Wilkes and the court's curative jury instruction, Wilkes has also not demonstrated any prejudice.

**e**

Wilkes maintains that "this Court should analyze the overall cumulative impact of all errors upon the fundamental fairness of the trial." Appellant Br. 54. He contends that the "*Brady/Giglio* violations, the grand jury violations, and the false and improper arguments, separately and cumulatively require reversal." Appellant Br. 62-63.

"In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). "[W]here the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *Id*. "Our court is particularly sensitive to

allegations of prejudice where, as here, the convictions are based on largely uncorroborated testimony of a single accomplice or co-conspirator." *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988).

**[17]** Wilkes has not demonstrated that the cumulative effect of the alleged *Brady/Giglio* violations, grand jury violations, and false and improper arguments would have altered the verdict. Wilkes has not established any *Brady/Giglio* violations. He does not even allege, nor does he establish, that the grand jury leaks caused his trial to be prejudiced. The government's alleged improper arguments to the jury, which Wilkes challenges on appeal, do not constitute plain error because Wilkes has failed to show both misconduct and prejudice. Moreover, in contrast to this circuit's cases that reversed a defendant's convictions based on cumulative error, the government in this case presented ample evidence of Wilkes's guilt. *Cf. Frederick*, 78 F.3d at 1381; *Wallace*, 848 F.2d at 1475.

**V**

**[18]** Wilkes maintains that his Fifth and Sixth Amendment rights were violated by the district court's denial of his requests for a continuance of trial in order to enable his counsel to review voluminous discovery. Denials of motions for trial continuances are reviewed for abuse of discretion. *United States v. Garrett*, 179 F.3d 1143, 1144-45 (9th Cir. 1999). "A trial court clearly abuses its discretion only if denial of the continuance was arbitrary or unreasonable." *United States v. Torres-Rodriguez*, 930 F.2d 1375, 1383 (9th Cir. 1991). Prejudice resulting from the denial of the continuance must be established. *United States v. Kloehn*, 620 F.3d 1122, 1127 (9th Cir. 2010). "Where the denial of a continuance prevents the introduction of specific evidence, the prejudice inquiry focuses on the significance of that evidence." *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1142 (9th Cir. 2005) (quoting *United States v. Mejia*, 69 F.3d 309, 317 (9th Cir. 1995)).

**[19]** Wilkes has failed to establish that actual prejudice resulted from the denial because he has not shown that his verdict would have been different had the district court granted his request for continuance. *See Armant v. Marquez*, 772 F.2d 552, 556-57 (9th Cir. 1985) ("At a minimum . . . in order to succeed, [a defendant] must show some prejudice from the court's denial."). Although Wilkes identified a number of documents that he contends he could have used to bolster his defense had he been afforded additional time, these documents do not support Wilkes's contention that his defense would have been bolstered by them. Moreover, some of the documents identified were clearly available to Wilkes at the time of trial as evidenced by the fact that they were marked as *defense* exhibits.

## VI

Wilkes contends that the Supreme Court's recent decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010) compels reversal of all counts — but especially those predicated upon honest services fraud, including the conspiracy, money laundering, and criminal forfeiture counts — because the evidence presented at trial was insufficient to convict him on all counts, and the jury was misinstructed on these counts. Sufficiency of the evidence is reviewed de novo. *Moreland*, 622 F.3d at 1168. This court reviews the evidence in the light most favorable to the prosecution to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* "[C]onstitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Skilling*, 130 S. Ct. at 2934 (citing *Yates v. United States*, 354 U.S. 298 (1957)). "Any omission or misstatement of an element of an offense in the jury instructions is constitutional error and, therefore, requires reversal unless we find the error 'harmless beyond a reasonable doubt.' " *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). "In the absence

of a timely objection to the jury instructions, we review for plain error." *Id.* (internal quotation marks omitted). Plain error requires the court to find (1) an error that is (2) plain and (3) affects substantial rights. *Id.* An error prejudices the substantial rights of a defendant when it affects the outcome of the proceedings. *Moreland*, 604 F.3d at 1077. Even if these conditions are met, this court may only exercise its discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

**[20]** In *Skilling*, the Supreme Court held that honest services fraud theories other than bribery and kickback schemes are invalid. 130 S. Ct. at 2931. The evidence against Wilkes of honest services fraud, however, was sufficient to convict because the government proved that Wilkes engaged in a scheme to defraud the United States and its citizens of their right to Cunningham's honest services, and that this scheme involved both quid pro quo bribery and material misrepresentations. *See United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980) ("The requisite 'scheme . . . to defraud' is found in the deprivation of the public's right to honest and faithful government. When a public official is bribed, he is paid for making a decision while purporting to be exercising his independent discretion. The fraud element is therefore satisfied.").

**[21]** The jury convicted Wilkes of federal bribery under 18 U.S.C. § 201. The government presented substantial evidence that Wilkes engaged "in a course of conduct of favors and gifts" in exchange for benefits and support from Cunningham. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009) (bribery violation's requisite quid pro quo satisfied by " 'a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor' ") (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998)) (footnote and additional citations omitted). Thus, the jury's guilty verdict on the separate substantive count of bribery in violation of 18 U.S.C.

§ 201 confirms beyond any reasonable doubt that the jury would have convicted Wilkes of honest services fraud if the court's definition had been limited to the bribery basis that *Skilling* expressly approved. Any error concerning the jury instruction was harmless. *See Neder v. United States*, 527 U.S. 1, 18 (1999) (error is harmless where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").

## VII

### A

Wilkes contends that the evidence presented at trial was insufficient to support a conviction of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and that the district court erred in instructing the jury on the concealment money laundering count. Insufficient evidence claims are reviewed de novo, *Moreland*, 622 F.3d at 1162, as are claims of instructional error. *Kilbride*, 584 F.3d at 1247.

**[22]** "The federal money laundering statute, 18 U.S.C. § 1956, prohibits specified transfers of money derived from unlawful activities. Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation." *Regalado Cuellar v. United States*, 553 U.S. 550, 556 (2008). Wilkes was convicted under the financial transactions provision, § 1956(a)(1).

**[23]** Under § 1956(a)(1)(B)(i), transactions involving proceeds of unlawful activity are illegal if they are "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" ("concealment money laundering").

To convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must

prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew "that the transaction [was] designed in whole or in part — (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

*United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).

Thus, "[t]he money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds. 'In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business.' " *Id.* at 322 (citing *United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003)); *see also United States v. Majors*, 196 F.3d 1206, 1212 n.12 (11th Cir. 1999) ("Section 1956(a)(1)(B)(i) is a provision structured to reach those types of money laundering activities designed to conceal or disguise the attributes of proceeds produced by unlawful activity."); *United States v. Wynn*, 61 F.3d 921, 926 (D.C. Cir. 1995) ("[T]he activity that section 1956 seeks to prevent [is] injecting illegal proceeds into the stream of commerce while obfuscating their source."); *United States v. Sanders*, 929 F.2d 1466, 1472 (10th Cir. 1991) ("[T]he purpose of the [concealment] money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities.").

**[24]** "[T]ransactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction. . . ." *United States v. Seward*, 272 F.3d 831, 836 (7th Cir.

2001); *see also United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998) ("[M]oney laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds."). Furthermore, where a defendant takes no steps to disguise or conceal the source or destination of the funds, leaving an easy-to-follow trail in moving money around, those "transactions conspicuously lack the 'convoluted' character associated with money laundering." *Adefehinti*, 510 F.3d at 322, 324 (reversing convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) where defendants merely allocated the proceeds from a fraudulent sale of property through transactions that "amount[ed] to no more than divvying up the joint venture's gains, albeit illegally obtained"). "Having carried out a fraud of which concealment was an integral part, defendants cannot be charged with the same concealment a second time, as if it were the sort of independent manipulation of the proceeds required for money laundering." *Id.* at 324.

"Classic examples of § 1956(a)(1)(B)(i) violations involve drug dealers who receive tainted money and then try to 'launder' it by using it in apparently legitimate transactions." *United States v. Pretty*, 98 F.3d 1213, 1220 (10th Cir. 1996). In those cases, "the laundering naturally occurs after the underlying drug crime is complete." *Id.* "Section 1956 covers far more than merely 'classic' money laundering, however." *Id.* "The legislative history . . . stresses the wide scope of money laundering and notes the complexity of schemes in which criminals 'disguise the illegal nature and true sources of their income.' " *Id.* (citing S. Rep. No. 433, 99th Cong., 2d Sess. (1986)). As the Seventh Circuit explained in *United States v. Boscarino*, 437 F.3d 634 (7th Cir. 2006):

> Consider, for example, the bribery of public officials, as in *United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985). Judge Murphy took money from litigants in cases over which he presided. Doing this deprived the public of his honest services. He did not

take money from the public coffers, but the bribes were 'proceeds' of the scheme to defraud, and if he had engaged in financial transactions with these proceeds Judge Murphy could have been convicted of money laundering as well as the scheme to defraud the public.

*Boscarino*, 437 F.3d at 636. That is exactly what happened in *United States v. Pretty*, 98 F.3d 1213 (10th Cir. 1996).

In *Pretty*, a jury convicted defendants Pretty and Whitehead of 32 counts of "(1) engaging in a bribery or kickback scheme, in violation of 18 U.S.C. § 666; (2) conspiring to engage in this scheme, in violation of 18 U.S.C. § 371; and (3) money laundering, in violation of 18 U.S.C. §§ 1956, 1957." *Pretty*, 98 F.3d at 1216-17. The government uncovered numerous financial transactions among Patricia Whitehead, Deputy State Treasurer for the State of Oklahoma, Pretty, and another — Patrick Kuhse — demonstrating that Whitehead was receiving kickbacks from Kuhse, often through Pretty as a middleman, in return for sending business his way. *Id.* at 1216. On appeal, Whitehead argued that those "transactions cannot be the basis of § 1956(a)(1)(B)(i) [concealment money laundering] liability because they were part and parcel of the kickback scheme." *Id.* at 1220. *See e.g., Majors*, 196 F.3d at 1212 ("A violation of the concealment provision must 'follow in time' the completion of the underlying transaction as an activity designed to conceal or disguise the origins of the proceeds.").

**[25]** The charges under § 1956(a)(1)(B)(i) were based on a trust set up by Pretty and funded by Kuhse, who pled guilty to money laundering in a separate proceeding. *Pretty*, 98 F.3d at 1220; *United States v. Kuhse*, No. 98-6076, 1998 U.S. App. LEXIS 27612, at *2 (10th Cir. Oct. 28, 1998). Pretty approved a loan to Whitehead and her husband from the trust to finance the Whiteheads' new house. *Pretty*, 98 F.3d at 1220. The defendants claimed that the transactions were

negotiated at arms' length. *Id.* The Tenth Circuit concluded that the jury's inference that the intent of the transactions at issue was at least in part to conceal the source of the funds was a reasonable one. *Id.* The court explained that "[a] direct payment from Kuhse to Whitehead would have violated § 666 without constituting money laundering. The effort to disguise the source of the money was an additional act that is separately punishable under § 1956(a)(1)(B)(i), notwithstanding the simultaneity of the two crimes." *Id.* at 1220-21.

**[26]** Here, Wilkes's multiple transfers are separately punishable under § 1956(a)(1)(B)(i). On May 6, 2004, Wade issued a $5,970,000 check, to ADCS, Inc. Wilkes had this check deposited into an ADCS, Inc. account. At that point, Wilkes could have sent $525,000 to Cunningham or Coastal directly. That conduct would have violated 18 U.S.C. § 201 (bribery), without violating 18 U.S.C. § 1956(a)(1)(B)(i) (money laundering). *Pretty*, 98 F.3d at 1220-21. Instead, Wilkes transferred the $525,000 to another of his accounts, WBR Equities. At that point, Wilkes could have sent the $525,000 from WBR Equities to Cunningham or Coastal Capital directly. Again, he did not. Instead, he wired $525,000 from WBR Equities to Parkview Financial, Inc. In the meantime, Parkview Financial and Coastal had engaged in a series of transactions of their own, which provided additional buffers between the corrupt contract and the payoff of Cunningham's mortgage. Concealing this connection appears to be the dominant, if not the only, purpose of these multi-layered transactions.

**[27]** The prosecution argued, and the jury apparently found, that the charged money laundering transaction was the last in a series of transactions made to conceal Wilkes's $525,000 payment to Cunningham for securing government contracts for Wilkes. Unlike in *Adefehinti*, where defendants merely allocated the proceeds from a fraudulent sale of property through relatively straightforward transactions that "amount[ed] to no more than divvying up the joint venture's

gains, albeit illegally obtained," 510 F.3d at 322, Wilkes's effort to disguise the source of the kickback to Cunningham was an additional act that is separately punishable under § 1956(a)(1)(B)(i). *Pretty*, 98 F.3d at 1220-21.

**[28]** Unlike bribery, which requires proving the intent to influence or induce a public official beyond a reasonable doubt, concealment money laundering merely requires that the financial transaction be designed to "conceal . . . the source . . . or control . . . of the proceeds of the specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Though the payoff to Cunningham came from attorney Thomas Cusack via a purchaser, Rodney Baussan, and not from Wilkes, "taking steps to make funds appear legitimate is the common meaning of the term 'money laundering.' " *Regalado Cuellar*, 553 U.S. at 558. The evidence presented at trial was sufficient to allow a reasonable finder of fact to determine that Wilkes engaged in a number of financial transactions, including transferring the money to three different accounts within the course of a single week, in an attempt to conceal both the source and future ownership of the money. The evidence presented was sufficient to support the reasonable inference that Wilkes's financial transactions — intended to pay $525,000 to Cunningham — were "convoluted," rather than "simple transactions that can be followed with relative ease, or transactions that involve nothing but the initial crime," and thus sufficient to convict Wilkes of concealment money laundering as to the financial transaction described in Count 20 of the indictment. *Adefehinti*, 510 F.3d at 322-24.

**B**

Wilkes also argues that "the jury instructions regarding money-laundering are constitutionally deficient because they do not correctly define 'proceeds' . . . and they also direct a verdict against the defendant." Appellant Br. 82. Wilkes argues that *United States v. Santos*, 553 U.S. 507 (2008) is applicable here and thus raises a question of merger.

Unlike Wilkes who was convicted of *concealment* money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), Santos was convicted of gambling and *promotional* money laundering crimes under 18 U.S.C. § 1956(a)(1)(A)(i). *Santos*, 553 U.S. at 509-10. Under § 1956(a)(1)(A)(i), transactions involving proceeds of unlawful activity that "promote" criminal activity are illegal ("promotional money laundering"). Promotional money laundering is "different from traditional money laundering because the criminalized act is the reinvestment of illegal proceeds rather than the concealment of those proceeds." *United States v. Jolivet*, 224 F.3d 902, 909 (8th Cir. 2000).

> A person commits "promotional" money laundering if, (1) "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," he (2) "conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," (3) "with the intent to promote the carrying on of specified unlawful activity."

*United States v. Cedeno-Perez*, 579 F.3d 54, 57 (1st Cir. 2009) (quoting 18 U.S.C. § 1956(a)(1)(A)(i)).

In *Santos*, "[t]he Court addressed the question whether 'proceeds,' left undefined in the definition of money laundering in 18 U.S.C. § 1956, is defined as 'profits' or 'receipts' (also called 'gross receipts'). After concluding that no definition predominated, a plurality determined the rule of lenity required the narrower 'profits' definition be adopted."[1] *United States v. Webster*, 623 F.3d 901, 905 (9th Cir. 2010) *cert.* denied, 131 S. Ct. 1836 (2011) (citing *Santos*, 128 S. Ct. at 2024 (Scalia, J., joined by Souter, Thomas, & Ginsburg, J.J.,

---

[1]Congress has since amended 18 U.S.C. § 1956 to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).

and announcing the judgment of the Court)). The Court explained that to hold otherwise in the promotional money laundering context would create a merger problem, because:

> [i]f "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute.

*Santos*, 553 U.S. at 515-16. Thus, "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid. Defraying an activity's costs with its receipts simply will not be covered." *Id.* at 517.

Relying on *Santos*, Wilkes argues that the government failed to prove the second element of the money laundering offense because money laundering involves profits, while the wire transfer of $525,000 from WBR Equities in San Diego, California to Financial Company "A" in Rosedale, New York (which was to be used to pay off the second mortgage on Cunningham's Rancho Santa Fe home), was merely an expense associated with the bribery and, thus, not "proceeds" under 18 U.S.C. § 1956(a)(1)(B)(i).

In *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), this court construed *Santos* as a decision "with less than clear results," *Van Alstyne*, 584 F.3d at 807, but concluded that " 'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." *Id.* at 814. In other words, under *Santos*, "proceeds" as used

in 18 U.S.C. § 1956 means "gross receipts" except where the money transfers are "inherent in the scheme." *United States v. Ferguson*, 412 Fed. Appx. 974, 975-977 (9th Cir. 2011).

In *Webster*, we "recognize[d] that four Justices in the *Santos* plurality stated that the merger problem might exist for certain payments among conspirators." *Webster*, 623 F.3d at 906 (citing *Santos*, 128 S. Ct. at 2026-27 (Scalia, J., joined by Souter, Thomas, & Ginsburg, J.J.) (stating, "any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares")). This court noted in *Webster*, however, that "this minority view is not controlling" and that "five Justices in *Santos* expressly agreed that 'the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Webster*, 623 F.3d at 906 (citing *Santos,* 128 S. Ct. at 2032 (Stevens, J., concurring in the judgment)); *see Santos,* 128 S. Ct. at 2035 & n.1 (Alito, J., dissenting).

Accordingly, we held in *Webster* that under *Santos,* where "a money laundering count is based on transfers among co-conspirators of money from the sale of drugs, 'proceeds' includes all 'receipts' from such sales." *Id.* (citing *Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1034 (9th Cir. 2009) (explaining that, when the Supreme Court issues "no majority opinion and the plurality takes a legal position more far-reaching than the position of a concurring [J]ustice or [J]ustices[,] . . . the narrowest view that commands a majority of [J]ustices is the law" (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)))).

**[29]** Wilkes has not shown that the Supreme Court's decision in *Santos* required the jury instructions regarding money laundering to define "proceeds" as "profits." Under *Webster*, Wilkes's money laundering count was based on a transfer to

a co-conspirator of money from honest services fraud and bribery such that "proceeds" would include all "receipts" from the fraud. Additionally, under *Boscarino*, 437 F.3d at 636, the bribes paid to Cunningham constituted "proceeds" of the scheme to defraud. Wilkes's multiple transfers of funds was an additional act that is separately punishable under § 1956(a)(1)(B)(i), as previously explained. Wilkes's merger argument, thus, lacks merit.

## VIII

Wilkes argues that the criminal forfeiture imposed upon him, the amount of which was determined by the trial court rather than by the jury, violated the Sixth Amendment in view of the holding in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Wilkes, however, has not shown that he made a timely request for a jury determination of criminal forfeiture as required under Federal Rule of Criminal Procedure 32.2(b)(4) (2008) (amended 2009); *see, e.g., United States v. Poulin*, 690 F. Supp. 2d 415, 433 (E.D. Va. 2010) ("Pre-amendment Rule 32.2 clearly requires Defendant to make an express request that the jury be retained in order to invoke that right."). Wilkes waived his right to challenge the judge's determination of forfeiture on appeal, thus we review for plain error. *United States v. Hively*, 437 F.3d 752, 763 (8th Cir. 2006). Wilkes has not shown that the district court plainly erred in its forfeiture order. *Id*.

## CONCLUSION

Under this Court's holding in *Straub*, the district court's determination that it was not authorized to compel use immunity for defense witness Williams absent a finding of prosecutorial misconduct was erroneous. Because the district court concluded that the proffered testimony would "counter" the testimony presented by the prosecution through immunized government witnesses, and the government did not challenge that finding as clearly erroneous, we remand this matter to the

district court with instructions to conduct an evidentiary hearing to determine whether compelled use immunity regarding Williams's proposed testimony was constitutionally required. *Straub*, 538 F.3d at 1151.

We affirm the district court's judgment of conviction in all other respects.

**AFFIRMED in part and REMANDED in part with instructions.**