NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   WW-11-1486-KiJuH |
| ERIC G. CARLSON, | Bk. No.   10-47408 |
| Debtor. | Adv. No.   10-04412 |
| CARSON TAYLOR, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| ERIC G. CARLSON, | |
| Appellee. | |

Argued and Submitted on March 23, 2012,
at Seattle, Washington

Filed - May 22, 2012

Appeal from the United States Bankruptcy Court
for the Western District of Washington

Honorable Brian D. Lynch, Bankruptcy Judge, Presiding

Appearances:   David Clement Smith, Esq. argued for appellant, Carson Taylor; Deirdre P. Glynn Levin, Esq. of Keller Rohrback LLP argued for appellee, Eric G. Carlson.

Before: KIRSCHER, JURY, and HOLLOWELL, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appellant, Carson Taylor ("Taylor"), appeals a judgment from the bankruptcy court determining that the debt owed to him by Eric G. Carlson ("Debtor") was dischargeable. We AFFIRM.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    Events leading up to the nondischargeability action.**

The following facts are largely undisputed. Taylor moved to Centralia, Washington in September 2007. At that time, he was employed as a funeral director of a mortuary operated by Daniel LaPlante ("LaPlante"). Upon Taylor's arrival to Centralia, LaPlante made arrangements for Taylor to rent a house from Dolores McMurphy ("McMurphy"), a local elderly woman known to be someone of wealth. McMurphy was in her early 80's at the time Taylor began renting her house in Centralia; Taylor was approximately 36. During this time, McMurphy was living alone in another house in a different city.

LaPlante introduced Taylor to the Debtor in late 2007 or early 2008, and the two men became friends. At that time, the Debtor had lived in the Centralia area for about 15 years. In or about February 2008, McMurphy decided to sell her home and move into the rental house with Taylor. Her home sold for $285,000. The Debtor helped McMurphy and Taylor with the move. Around this same time, Taylor and McMurphy went to see McMurphy's attorney, Paul Dugaw ("Dugaw"), about an alleged theft by her prior caregivers.

In June 2008, McMurphy transferred her bank accounts into joint accounts with Taylor. Later that same month, McMurphy signed a durable power of attorney ("POA") naming Taylor as her attorney in fact. The POA was not prepared by Dugaw, McMurphy's

-2-

known attorney; rather, it was prepared by attorney Brian Kelly, who apparently had no other involvement with McMurphy or her case against the prior caregivers. Also in June 2008, McMurphy transferred title of all of her real property holdings by quitclaim deed out of her name and into joint tenancy with right of survivorship with Taylor.

In June/July 2008, Taylor and the Debtor began discussing the possibility of a loan for use in Debtor's business. In 2008, the Debtor owned and operated two entities, Archimedes Group International, Inc. ("AGI") and College Enrollment Services ("CES"), which were in the business of placing foreign students in colleges and universities in the United States. The Debtor had been in the foreign student placement business for over 20 years, 15 of which he was in business for himself. After closing his previous business Academic Exchange of America in 2007, the Debtor went forward with his new business plan with AGI and CES, in which he worked with colleges in the U.S., particularly community colleges to place foreign students under a visa program sponsored by the State Department. In his early marketing efforts, the Debtor was able to convince 12 community colleges to pay him $10,000 each to begin recruiting foreign students to place with their college, and to pay him additional funds for those students he placed.

In addition to operating AGI and CES, the Debtor was (and still is) managing a local medical office for a physician named Dr. Floyd Smith ("Dr. Smith"). The Debtor's job duties include procurement, staff management, payables, and handling other office-related matters. Coincidentally, Dr. Smith is McMurphy's

physician.

On July 24, 2008, Taylor wrote the Debtor a check for $300,000 from the McMurphy/Taylor joint checking account. Three days later on July 27, the Debtor signed a promissory note he prepared, payable to Taylor and effective as of July 24, 2008. The loan was unsecured, provided 6% interest, called for monthly payments of the accruing interest on the first day of each month starting August 1, 2008, and payment of the principal and any remaining interest was due in one year on August 1, 2009. It is undisputed that the funds came from McMurphy. It is also undisputed McMurphy was earning only 2% interest on the funds in a certificate of deposit and that the Debtor offered to pay a significantly higher interest rate of 6%. Coincidentally, the $300,000 loan was approximately the same amount McMurphy realized in proceeds from selling her home in February 2008.

The Debtor made payments to Taylor on the loan from August 2008 to January 2009. Although the check for the loan was written from the joint McMurphy/Taylor account, Taylor deposited each of the monthly interest payments from the Debtor into an account in Taylor's name only. After receiving the loan, the Debtor traveled extensively worldwide trying to recruit students for his new venture. Despite his efforts, the business did not succeed, which he attributed to the meltdown of the world economy.

The Debtor sent a last check and letter to Taylor in August 2009 asking Taylor to extend the maturity date of the loan. Taylor did not agree to the extension and responded by filing a complaint in his own name against the Debtor in state court on August 20, 2009, for breach of contract. In his deposition taken

-4-

during the state court action, Taylor was unable to answer any questions about his relationship with McMurphy because an investigation by Adult Protective Services ("APS") was pending against him.  When asked about his friendship with the Debtor, Taylor testified that they ceased being friends in September 2008, just two months after the loan:

> Q:   And what happened in September?
>
> . . . .
>
> A:   We were in a relationship.  I found he was hooking up with people on online porn, and I didn't want somebody like that in my life.

Taylor Dep. (Mar. 24, 2010) at 34:8-17.

In May 2010, Taylor obtained a summary judgment in the state court action for approximately $330,000, which included the principal balance on the note, interest, attorney's fees and costs.  The Debtor filed a chapter 7[2] bankruptcy on September 9, 2010.

**B.    The nondischargeability action.**

In December 2010, Taylor filed a nondischargeability complaint seeking to except his debt from discharge under § 523(a)(2).  A one-day trial was set for July 20, 2011.

On July 11, 2011, Taylor's new counsel, retained just six weeks prior, filed a motion to continue the trial date, which was heard expeditiously on July 13, 2011.  Taylor contended a continuance was warranted because the Debtor had failed to respond to certain discovery requests made in April 2011 by Taylor's

---

[2]   Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  The Federal Rules of Civil Procedure are referred to as "FRCP."

former counsel for tax returns, bank statements, and other financial documents. The Debtor opposed the continuance. At oral argument, Taylor explained he was attempting to obtain a copy of the financial statement he claimed the Debtor showed him prior to making the loan, which supported his claim under § 523(a)(2)(B). Debtor's counsel agreed to turn over the requested financial documents by the end of the day.

The court orally denied the motion to continue. It reasoned that Taylor's former counsel was complicit with the production problem since he failed to ever file a motion to compel and, in any event, the Debtor was making a considerable effort to try to respond. The court noted that if Taylor believed the documents to be nonresponsive, he could return and ask for further disclosure. No order was entered on the motion to continue.

Also on July 13, 2011, the Debtor filed a motion in limine seeking to exclude the following evidence at trial: (1) either Taylor's or the Debtor's sexual preference or orientation; (2) Taylor's transgender surgical procedures; (3) Taylor's and the Debtor's one-time sexual relationship; (4) statements by the state court judge not part of the record; (5) the Wells Fargo adversary complaint and the Debtor's settlement with same; (6) Taylor's statements about the contents of the financial statement he claimed the Debtor showed him prior to the loan; (7) documents or witness testimony not disclosed; and (8) alleged oral statements the Debtor made to Taylor about his financial affairs.

On July 19, 2011, the Debtor filed an amended motion in limine seeking to exclude only two things - Taylor's statements about the contents of the financial statement he claimed the

Debtor showed him prior to the loan, and the alleged oral statements the Debtor made to Taylor about his financial affairs.

Taylor opposed the amended motion in limine. On the morning of trial, the parties submitted a stipulated order agreeing to exclude the following: (1) either parties' sexual preference or orientation; (2) either parties' physical or mental health, or any medical, surgical, or mental health related treatments or procedures; (3) either parties' sexual relationship or relationships with others; (4) statements by the state court judge not contained in the record; (5) the Wells Fargo adversary complaint and settlement; and (6) documents or witness testimony not disclosed.

The one-day trial proceeded on July 20, 2011. The Debtor and Taylor were the only witnesses. Although McMurphy was present in the courtroom and Taylor had identified her as a witness, Taylor announced at the beginning of trial that he would not be calling her as a witness.

Taylor testified that he, the Debtor, and McMurphy did the loan transaction at the kitchen table of the home shared by him and McMurphy. Taylor claimed that when the Debtor approached him for the $300,000 loan, he had told Taylor that he received this same amount every year via a line of credit from Security State Bank ("Security") to run his business. Taylor testified that, prior to the loan, the Debtor promised that if at any time McMurphy needed the money sooner than the agreed one-year term, he could obtain a loan from Security and pay it back. Taylor further testified the Debtor told him he would be able to repay the loan because his business had made a $2 million profit the previous

-7-

year, and he saw no reason for a decline. Taylor also testified that when he asked the Debtor about whether an attorney should handle the loan transaction, the Debtor responded that lawyers just created work for themselves, were unnecessary, and they did not need one. As for any documentation, Taylor testified that prior to signing the note, the Debtor showed him a 2007-2008 income statement proving his businesses' $2 million profit. Taylor said that he relied on all of these statements prior to giving the Debtor the loan.[3]

When asked why the promissory note was in his name only, Taylor testified that the Debtor suggested drafting the note that way due to McMurphy's age, and that he had told Taylor it would be easier for him to pursue collection without her name on it. Taylor also testified that the Debtor had suggested the idea of opening a savings account in Taylor's name for depositing the loan interest payments so he could easily determine the loan's profitability.

Taylor testified that the Debtor suggested executing the POA for McMurphy because the Debtor believed Dugaw was after McMurphy's money to replace $400,000 he had allegedly lost in a hedge fund deal with his son. According to Taylor, the situation

---

[3] Although not included in the record, Taylor read into the record at trial a portion of an affidavit from McMurphy that was filed in the state court action:

> The loan to Eric Carlson was done with my prior knowledge and permission. With my prior knowledge and permission, Carson Taylor has collected monthly payments from Eric Carlson and has deposited the payments into our originating joint account, as well as other accounts held in Carson Taylor's name only.

Trial Tr. (July 20, 2011) at 37:15-20.

-8-

caused McMurphy to be distrustful of Dugaw, "[a]nd it kind of made us feel alone and vulnerable with APS, because they turned on me instead of the caregiver who stole from her." Trial Tr. at 29:18-21. Taylor further testified that he was familiar with McMurphy's financial situation by early 2008, but that he did not give the Debtor any of this information. However, Taylor said that just days before the loan, the Debtor had told him that he met with Dugaw to discuss McMurphy's financial situation. Taylor also claimed that Dugaw had billed McMurphy for his consultation with the Debtor.

When asked about the quitclaim deed transferring all of McMurphy's real property into joint tenancy with Taylor, Taylor testified that the Debtor told him and McMurphy to do it "to hide Dolores's money so that lawyers wouldn't get it, like Paul Dugaw, who was after her to replace the hedge fund." Trial Tr. at 67:18-68:1. Taylor claimed he did not know exactly what a quitclaim deed would accomplish and that he had to call the Debtor from the title company to get instruction on how to fill it out.

The Debtor then testified as an adverse witness for Taylor. He testified that he never spoke with McMurphy about borrowing money for his business; he spoke only with Taylor. The Debtor said that Taylor was looking for a way to earn more interest on McMurphy's recent home sale proceeds, so he offered to pay Taylor 6% interest on a loan for his new business. The Debtor denied telling Taylor any specifics about his financial condition, but he did admit telling Taylor that he had lines of credit with Security, that he had them for the past 12 years, and that his new business would generate sufficient funds to pay the loan and make

a profit.  The Debtor denied telling Taylor that he could access the lines of credit to pay back the debt if needed; the lines of credit had already been exhausted by that time.

The Debtor testified that at the time of the loan he had no knowledge of Taylor's POA for McMurphy, and he denied having anything to do with it.  When asked if he was concerned about McMurphy's name being on the check but not on the promissory note, the Debtor testified that he knew "that there had been a history of Ms. McMurphy handing out money to people around town for various reasons, in amounts larger than this, that promissory notes had not been given to her or to her agent," and that he "felt that it was appropriate to draft a promissory note."  Trial Tr. at 90:20-91:2.  The Debtor was never asked about whether it was his idea to leave McMurphy's name off of the promissory note, or whether he instructed Taylor and McMurphy to execute the quitclaim deed to protect McMurphy from Dugaw.

Counsel then questioned the Debtor about an email from him to Dugaw dated July 15, 2008, just nine days before the loan, which was entered as Exhibit P-2.  Prior to reviewing the email, the Debtor described Dugaw as a "friend and a neighbor" and claimed that Dugaw was attempting to help McMurphy at that time, but that McMurphy was uncomfortable with the situation.  Trial Tr. at 104:22-23.  In paragraph two of the email, the Debtor states to Dugaw: "Dolores has shared with me very specifically what she has been trying to direct you to do."  Id. at 105:6-8.  When asked what McMurphy was trying to "direct" Dugaw to do, the Debtor said he could not recall the specifics and could not answer the question.  The Debtor claimed the email was regarding the APS

-10-

investigation and Dugaw's involvement with that, and also with McMurphy's involvement or having been seen as a patient at Dr. Smith's office. Counsel went on to read Debtor's email to Dugaw: "'Carson is doing a great job with her, and it is a match made in heaven. Too many professionals seem to be circling like buzzards working to get their share. I challenge you to rise above it and not overdo, as you sometimes have a tendency to do.'" Id. at 107:14-20. Upon questions regarding the meaning of this statement, the Debtor now was not sure if Dugaw was ever McMurphy's attorney, knowing only that they had met a couple of times to discuss her financial affairs.

Counsel continued reading the Debtor's email: "'Despite how you or I would operate, Dolores and Carson have come to their own agreement, which they are comfortable with. I know the attorney in you wants to be involved. But that is due to out [sic] fact that you want to also charge. And I can tell you that there is no indication that they need any other services.'" Id. at 108:7-13. To this, the Debtor responded that during this time Dugaw was suggesting McMurphy's monthly bills and payments of those bills be run through his office, but he thought that was unnecessary. Upon counsel's question of whether the Debtor was having conversations with McMurphy about her financial situation in July 2008, he again denied speaking to McMurphy about his loan prior to the transaction, but he admitted having conversations with her about her desire to remain independent and how she and Taylor were a good match for living together. When pressed further about inserting himself in McMurphy's financial affairs, the Debtor responded: "'Well, during that time there was much talk from

-11-

various people about wanting to represent Ms. McMurphy in a way that would put them in a position to be able to probate her estate upon her eventual death. And Mr. Dugaw was among one of those people. And I thought at that time that that was a bit self-serving.'" Id. at 109:20-110:5.

Finally, to explain the exhausted line of credit with Security, the Debtor testified that he had been involved in a lawsuit a few years prior to the loan transaction with Taylor, and that he had used the line of credit in May 2008 to pay off a $120,000 settlement.

The Debtor then moved for a directed verdict.[4] In denying the motion as to Taylor's § 523(a)(2)(A) claim, the bankruptcy court noted to Taylor's counsel:

COURT:    If I understand it, the (a)(2)(B), if there ever was
          an (a)(2)(B) claim, I don't think it's been made out.
          I don't have -- you haven't laid the proper
          foundation for a statement in writing. So I think
          (a)(2)(B), to the extent it existed and was a basis,
          is gone. . . . To the extent (a)(2)(B), I don't
          know -- Mr. Smith, are you even arguing (a)(2)(B)?

COUNSEL:  I gave it my best shot, Your Honor, but I do not
          believe that I can proceed forward in that manner
          effectively at this time.

COURT:    Well, (a)(2)(B) is dismissed, and (a)(2)(A) can
          proceed based on the testimony I've heard so far.

Id. at 126:17-22; 127:23-128:5.

The Debtor then proceeded to testify extensively about his business venture, his efforts to increase profits, and why it did not succeed. The Debtor denied producing any kind of financial

---

[4] Although the parties referred to it as a motion for "directed verdict," in federal court this procedure is more properly known as a motion for judgment on partial findings under Rule 7052(c).

-12-

statement to Taylor prior to the loan transaction. The Debtor testified that perhaps he could have run such a document from QuickBooks, but he never produced anything to give to Taylor. The Debtor denied ever telling Taylor that he expected his business to generate millions of dollars in revenue.

Taylor was then called as a rebuttal witness. Although the court had dismissed his § 523(a)(2)(B) claim, Taylor again testified that the Debtor showed him a 2007-2008 income statement prior to the loan transaction. Upon a hearsay objection to the line of questioning, which was overruled, the bankruptcy court noted that testimony about the document would be admissible only if the Debtor had prepared it, and Taylor had offered no evidence to that extent. Taylor proceeded to testify that the Debtor had told him he created the financial statement on QuickBooks, and that the document purported to show that the Debtor's business in the year prior had a $2 million profit. Taylor testified that the Debtor had shown the financial statement to both him and McMurphy at the kitchen table during the loan transaction.

After hearing closing argument from the parties, the bankruptcy court took the matter under advisement. The court issued its findings of fact and conclusions of law on August 23, 2011, finding that Taylor had failed to show justifiable reliance for his claim under § 523(a)(2)(A), and that he failed to provide sufficient evidence to support a claim under § 523(a)(2)(B). A judgment in favor of the Debtor on both claims was entered on August 24, 2011. Taylor timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C.

-13-

§§ 157(b)(2)(I) and 1334.  We have jurisdiction under 28 U.S.C. § 158.

### III. ISSUES

1.    Did the bankruptcy court err in finding that Taylor failed to prove the debt was nondischargeable under § 523(a)(2)(A)?

2.    Did the bankruptcy court err in finding that Taylor failed to provide sufficient evidence to support a claim under § 523(a)(2)(B)?

### IV. STANDARDS OF REVIEW

In claims for nondischargeability, the Panel reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo, and applies de novo review to "mixed questions" of law and fact that require consideration of legal concepts and the exercise of judgment about the values that animate the legal principles.  Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

The determination of intent to defraud, justifiable reliance, and proximate causation are questions of fact reviewed for clear error.  Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1456 (9th Cir. 1992) (justifiable reliance); First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986)(intent); Rubin v. West (In re Rubin), 875 F.2d 755, 758 (9th Cir. 1989)(proximate causation). If two views of the evidence are possible, the trial judge's choice between them cannot be clearly erroneous.  Hansen v. Moore (In re Hansen), 368 B.R. 868, 875 (9th Cir. BAP 2007).  A finding is clearly erroneous if it is illogical, implausible, or without support in the record.  United States v. Hinkson, 585 F.3d 1247,

-14-

1261 (9th Cir. 2009)(en banc).

Denials of motions for trial continuances are reviewed for abuse of discretion. United States v. Wilkes, 662 F.3d 524, 543 (9th Cir. 2011). A trial court abuses its discretion only if denial of the continuance was arbitrary or unreasonable. Id. The moving party must establish that prejudice resulted from the denial of the continuance. Id.

## V. DISCUSSION

**A.    The bankruptcy court did not err when it determined that Taylor failed to prove a claim under § 523(a)(2)(A).**

**1.    Section 523(a)(2)(A).**

Section 523(a)(2)(A) provides that, "A discharge under ... this title does not discharge an individual debtor from any debt (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

To prevail on a claim under § 523(a)(2)(A), a creditor must establish five elements: (1) the debtor made representations; (2) that at the time he knew were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the debtor's misrepresentations. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010). The creditor bears the burden of proving all five of these elements by a preponderance of the evidence. Id. In order to strike a balance

-15-

between allowing debtors a fresh start and preventing a debtor from retaining the benefits of property obtained by fraudulent means, exceptions to discharge under § 523(a)(2)(A) are construed strictly against creditors and in favor of debtors.  <u>Id.</u>

**2.    The bankruptcy court's findings.**

In its findings, the bankruptcy court observed that despite the conflicting testimony, it was clear the Debtor made himself quite involved with McMurphy's financial affairs, and his July 15, 2008 email to Dugaw was particularly telling.  The court observed that even though the Debtor and Dugaw were apparently friends and neighbors, his email to Dugaw "at various times ingratiates, persuades, compliments, criticizes, threatens and conciliates with Dugaw. . . .  Dugaw was obviously concerned about Taylor's relationship with McMurphy and [the Debtor] strives to convince him that, first, it is [a] 'match made in heaven,' and second, it is not his business."  Findings of Fact and Conclusions of Law (Aug. 23, 2011) at 3:22-26.  The Debtor had also attached to the email some of McMurphy's medical records from Dr. Smith, whose practice the Debtor manages in addition to his businesses.  We do not have the attachments in the record.  Nonetheless, other than mentioning the medical records, the bankruptcy court did not speculate about why they were attached, or how the Debtor obtained McMurphy's private medical records, or why the Debtor was disclosing her records to Dugaw, or what business McMurphy's medical condition was to the Debtor.

The bankruptcy court also observed that although Taylor had maintained at trial he was acting on behalf of McMurphy regarding the loan, he admitted putting the Debtor's loan payments into an

-16-

account in his name only. The court did not find persuasive Taylor's inexplicable claim that the Debtor had advised him to open an account in his individual name, not joint, so that Taylor could see how much money he was earning for McMurphy.

### a. Misrepresentations and intent to deceive.

Based on the totality of the circumstances, the bankruptcy court concluded that a fraud had been perpetrated and that the Debtor was at least part of it. The court determined that the Debtor's alleged statements about his businesses' income or about his line of credit with Security were not oral statements of financial condition falling under the exception to § 523(a)(2)(A), as he had argued, because representations about sources of income that could be looked to for repayment are not statements of financial condition. We agree. See Barnes v. Belice (In re Belice), 461 B.R. 564, 577-78 (9th Cir. BAP 2011)(adopting "narrow" view of interpreting the term "statement respecting the debtor's financial condition" under § 523(a)(2)(A) and holding that such statements "are those that purport to present a picture of the debtor's overall financial health."). In any event, the Debtor has not cross-appealed that finding.

The court found that at the time of the loan the Debtor "was in difficult financial straits, having used up his line of credit with [Security] to settle a lawsuit. He saw an opportunity to obtain control over an elderly woman's finances, and ultimately received $300,000, money he needed to finance his new venture." Findings of Fact and Conclusions of Law at 7:7-9. The court questioned why McMurphy was not the plaintiff in the action, and it further struggled with where Taylor fit into the story:

-17-

> Was he duped by [the Debtor], as he strove to suggest? Or is he trying to justify his actions after the fact as McMurphy's fiduciary, especially given the investigation by [APS]? Was this a scheme hatched by [the Debtor] and Taylor to take advantage of an elderly woman? Or is this lawsuit simply a matter of Taylor seeking retribution from [the Debtor] after their personal relationship fell apart?

Id. at 7:9-15.

### b. Justifiable reliance, causation, and damages.

Despite finding the Debtor had made misrepresentations, the bankruptcy court found that Taylor ultimately failed to prove he relied on these misrepresentations in making the loan, much less that his reliance was justifiable. Based on the evidence, the court found that Taylor would have made the loan to the Debtor regardless of the alleged misrepresentations. Ultimately, "Taylor failed to prove that [the Debtor] perpetrated a fraud on Taylor." Id. at 8:5-6. The court expressed concern over the fact that Taylor and the Debtor failed to call any other witnesses and, more importantly, that:

> Taylor stipulated not to produce evidence on a range of topics which one might expect to raise if one really felt himself the victim of a fraud. The Court was left largely with unsubstantiated representations by Taylor about what [the Debtor] told him, which [the Debtor] in turn denied. What light would Mr. Dugaw, or Mr. LaPlante or Mr. Kelly have shed on the story? The questions remain unanswered.

Id. at 8:8-12.

### 3. Taylor failed to prove the debt was nondischargeable under § 523(a)(2)(A).

Taylor argues on appeal that nothing in the facts suggest he was part of a conspiracy to defraud McMurphy, nor was any evidence presented by either party indicating that he was somehow involved

-18-

in the fraud. We disagree. As the plaintiff pursuing a nondischargeability action for fraud, Taylor, for obvious reasons, would not present any direct evidence showing his involvement in the fraud. The Debtor, trying to ensure the debt was discharged, also had no interest in presenting any direct evidence of a conspiracy with Taylor to defraud McMurphy. However, circumstantial evidence abounds to supports the bankruptcy court's suspicion that Taylor was involved.

First, Taylor obtained POA over a wealthy, elderly woman he knew for a matter of months. Immediately after obtaining the POA, McMurphy's bank accounts were transferred into joint accounts with Taylor, and McMurphy quitclaimed all of her real property into joint tenancy with Taylor. Within another month, Taylor was lending $300,000 of McMurphy's money to a man with whom he was having an intimate relationship and had known for only a short time. Taylor was also depositing the Debtor's loan payments into a savings account held solely in Taylor's name. Although Taylor claimed he did this at the Debtor's behest, the Debtor never corroborated Taylor's story. The Debtor also denied having anything to do with obtaining the POA, and he was never asked about whether he advised Taylor as to how to fill out the quitclaim deed. The Debtor also never corroborated Taylor's incredible story that only Taylor's name should be on the note due to McMurphy's age and for ease of collection. Notably, if McMurphy had passed away within the note's one-year term, the personal representative of her estate could have pursued a collection action against the Debtor just as easily as Taylor.

Next, the Debtor's email to Dugaw shows that Taylor was

-19-

allowing the Debtor to fend off Dugaw's inquiries about McMurphy's suspicious new circumstances. Taylor never explained why the Debtor needed to discuss McMurphy's financial affairs with Dugaw, or why Dugaw would discuss her private affairs with the Debtor, if the alleged meeting at Dugaw's office even took place. Presumably, some or all of this activity raised the suspicions of APS, and Taylor is now (or at least was) under investigation by that agency.

Finally, and what is most telling about Taylor's possible involvement with the fraud against McMurphy, is that no other witnesses were called, and Taylor's counsel at the last moment decided not to call McMurphy to the stand. Neither party offered affidavits from McMurphy, Dugaw, Kelly, LaPlante, or Dr. Smith. The stipulated order on the motion in limine raises more questions about Taylor's possible involvement.

Taylor also contends the bankruptcy court's findings indicate an erroneous belief that he lacked standing to bring the nondischargeability action. Taylor is referring to the court's statement: "Unfortunately and inexplicably, McMurphy is not the plaintiff in this action." Findings of Fact and Conclusions of Law at 7:9-10. Although the Debtor had raised standing as an affirmative defense in his answer, he never raised this issue in any pretrial motions, trial briefing, or at trial. Presumably, this defense was therefore waived. In any event, nothing in the bankruptcy court's findings questions Taylor's standing. If the court believed Taylor lacked standing, it seems unlikely the matter would have gone to trial. We interpret the court's statement about McMurphy to mean that she was the victim of the

-20-

Debtor's fraud, and perhaps Taylor's as well, and that she would have been a more suitable plaintiff in a nondischargeability action against the Debtor due to Taylor's potential involvement. Clearly, in the bankruptcy court's opinion, the circumstantial evidence against Taylor, the only plaintiff in this case, prevented him from successfully proving that he was defrauded by the Debtor.

Based on this record, we cannot conclude that the bankruptcy court's findings are illogical, implausible, or without support in the record. Due to the suspicious nature of the case, the court simply could not conclude that Taylor was duped by the Debtor. Accordingly, we affirm the judgment determining Taylor had failed to prove the debt was nondischargeable under § 523(a)(2)(A).

**B. The bankruptcy court did not err when it determined Taylor failed to prove a claim under § 523(a)(2)(B).**

**1. Section 523(a)(2)(B).**

Section 523(a)(2)(B) excepts from discharge a debt obtained by the debtor by "use of a statement in writing (I) that is materially false; (ii) respecting the debtor's . . . financial condition; (iii) on which the creditor to whom the debtor is liable . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." The Ninth Circuit has restated the elements of § 523(a)(2)(B) as seven factors: "(1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, [and] (7) that damage

-21-

proximately resulted from the representation." Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996). The creditor must prove these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991).

**2. The bankruptcy court's findings.**

The bankruptcy court concluded that Taylor presented insufficient evidence in either his case-in-chief or in rebuttal to meet his burden of proof on the elements of this claim. It found that Taylor's testimony about what the Debtor's alleged financial statement contained was "vague and minimal." Findings of Fact and Conclusions of Law at 6:16-17. Specifically, the court found that Taylor failed to establish the document's existence, or show (1) what the statement contained, (2) that the contents were material and false, and (3) that he relied upon it in making the loan.

**3. Taylor failed to prove a claim under § 523(a)(2)(B).**

At trial, Taylor's counsel indicated he was no longer pursuing the § 523(a)(2)(B) claim, conceding that he lacked sufficient evidence to support it. As such, Taylor may not have preserved this claim for appeal.

To the extent Taylor did preserve the issue, his opening brief fails to even recite the elements for a claim under § 523(a)(2)(B). He also fails to argue how the bankruptcy court erred with respect to any of its factual findings on this issue. Even though Taylor was unable to produce a copy of the financial statement he alleged the Debtor showed him prior to the loan, the court nonetheless allowed his testimony establishing the existence of the document and its contents. All Taylor said about the

-22-

alleged document in rebuttal was that the Debtor had told him he created the document on QuickBooks, which is suspect considering the Debtor had just testified that he created many of his financial documents on QuickBooks, and that the document reflected a $2 million profit for the Debtor's business. Taylor could not even provide the name of the company for which the document purported to show profitably. Taylor had also testified that the Debtor had shown the document to him and McMurphy at the kitchen table during the loan transaction. If true, and knowing that his claim was in jeopardy, why did Taylor choose to not submit an affidavit from McMurphy or to not call her as a witness to corroborate his story? Based on the evidence presented, we see no error by the bankruptcy court in determining that Taylor failed to establish a claim under § 523(a)(2)(B).

Taylor's only real dispute regarding this claim is that the bankruptcy court should have granted his request for a continuance.[5] Other than merely stating that "Mr. Taylor believed he would be prejudiced by the Court not allowing such a continuance," Taylor's opening brief fails to present any argument or authority in support of his position that the bankruptcy court abused its discretion in denying the continuance. He also failed to present the matter as an issue on appeal or provide a proper

---

[5] Neither party raised the issue that no order was ever entered denying Taylor's continuance request. Thus, the bankruptcy court's ruling on the matter was likely interlocutory. However, that interlocutory ruling "merged" into the final judgment determining the debt dischargeable and dismissing the adversary proceeding and is therefore an appealable issue. See United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, Cal., 545 F.3d 1134, 1141 (9th Cir. 2008)(under merger rule interlocutory orders entered prior to the judgment merge into the judgment and may be challenged on appeal).

-23-

standard of review in violation of Rule 8010(a)(1)(C).  As a result, this issue has been waived.  In re Sedona Inst., 220 B.R. 74, 76 (9th Cir. BAP 1998)(matters on appeal not specifically and distinctly argued in appellant's opening brief are waived).

Accordingly, we conclude the bankruptcy court did not abuse its discretion in denying Taylor's motion to continue trial, and we affirm the judgment determining that Taylor had failed to prove a claim under § 523(a)(2)(B).

## VI. CONCLUSION

Based on the foregoing reasons, we AFFIRM.