**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. HARINDER SINGH, AKA Lnu, Sonu, *Defendant-Appellant.* | No. 18-50423 D.C. No. 2:14-cr-00648-CAS-9 OPINION |

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted November 9, 2020
Pasadena, California

Filed May 3, 2021

Before: Barrington D. Parker,* Paul J. Watford, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Parker;
Partial Concurrence and Partial Dissent by Judge Watford

---

* The Honorable Barrington D. Parker, United States Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed Harinder Singh's convictions and sentence for conspiracy to launder money (18 U.S.C. § 1956(h)), conspiracy to operate an unlicensed money transmitting business (18 U.S.C. § 371), and operating such a business (18 U.S.C. § 1960), stemming from Singh's involvement in a hawala operation, a money transmitting network that he and his coconspirators used to move drug trafficking proceeds from Canada to the United States and eventually to Mexico.

Rejecting Singh's sufficiency-of-the-evidence challenge to his § 1956 conviction, the panel held that a jury could have reasonably concluded that Singh intended to conceal the ownership and control of the drug proceeds, as required by 18 U.S.C. § 1956(a)(1)(B)(i).

The panel also rejected Singh's sufficiency-of-the-evidence challenge to his convictions under § 1960, which provides that money transmitting "includes" transferring funds on behalf of the public. Explaining that "includes" deems what follows to be a non-exhaustive list of what the statute covers, the panel held that "on behalf of the public" is not a necessary element of § 1960. The panel disagreed with Singh's argument that because he did not advertise his services or make them generally available to everyone, his transactions were not "on behalf of the public." The panel

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

therefore concluded that Singh's conduct triggered liability under § 1960.  The panel held that even if "on the behalf of the public" were an element—which it is not—the government proved it.

As to Singh's contention that the government's closing arguments constructively amended the indictment's § 1960 counts, the panel saw no plain error.  The panel explained that the indictment charges that Singh worked with others in a money transmitting business based on the hawala network, which is not "distinctly different" from charging Singh with conducting his own money transmitting business, and that the indictment was not substantially altered at trial.

The panel held that the district court did not violate the Confrontation Clause, nor abuse its discretion, in limiting the cross-examination of a cooperating witness.

Without resolving whether a clear and convincing evidence standard or a preponderance of the evidence standard should apply, the panel held that the record supports, under either standard, the district court's application of an enhancement under U.S.S.G. § 2S1.1(b)(1) based on Singh's knowing that the laundered funds were drug trafficking proceeds.

Judge Watford concurred in part and dissented in part. He agreed with the majority that Singh's conduct rendered him guilty of operating an unlicensed money transmitting business in violation of § 1960, but in his view, Singh's conduct did not amount to participation in a money laundering conspiracy.

**COUNSEL**

Elizabeth Richardson-Royer (argued), San Francisco, California, for Defendant-Appellant.

Elana Shavit Artson (argued) and Carol Alexis Chen, Assistant United States Attorneys; L. Ashley Aull, Chief, Criminal Appeals Section; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

PARKER, Circuit Judge:

After a seven-day trial, a jury convicted Harinder Singh ("Singh") of one count of conspiracy to launder money (*see* 18 U.S.C. § 1956(h)), one count of conspiracy to operate an unlicensed money transmitting business (*see* 18 U.S.C. § 371), and one count of operating such a business (*see* 18 U.S.C. § 1960). The convictions stemmed from Singh's activities as a participant in a money transmitting enterprise which transferred and laundered drug trafficking proceeds.[1]

On this appeal, Singh raises a number of contentions, but principally argues that the government adduced insufficient evidence to support his conviction. He also argues that the government's proof at trial and its closing argument constructively amended the indictment and that the district court erroneously limited cross-examination of a

---

[1] The indictment, originally returned November 13, 2014, included 22 defendants. Most co-defendants entered pleas of guilty and did not proceed to trial.

government witness. Lastly, Singh argues that the court below erred in adding a six-level sentencing enhancement because he knew the laundered funds were drug proceeds. *See* U.S.S.G. § 2S1.1(b)(1). Finding no merit to these contentions, we affirm.

## BACKGROUND

Singh's convictions derive from his involvement in a hawala operation, a money transmitting network that he and his coconspirators used to move drug trafficking proceeds from Canada to the United States and eventually to Mexico. Considered in the light most favorable to the government, its proof at trial established the following. In early 2012, Gurkaran Singh Isshpunani began to work for Deepinder "Pindi" Singh, a drug trafficker, to transfer drug proceeds from Canada to the United States. As a hawala broker, Isshpunani collected Canadian funds from Pindi and worked with other hawala dealers (including the defendant) to coordinate the transfer of equivalent U.S. funds to California where they were used to pay Mexican drug suppliers. Singh worked in California. His primary role in the conspiracy was to deliver drug proceeds to various hawala brokers in California and elsewhere who then orchestrated the delivery of the funds to a Mexican drug cartel.

Hawala is a system designed to transfer funds from point to point outside of formal money transmission channels without the physical movement of money. Typically, the system is used to transfer funds from one country to another through hawala brokers. A broker in one country receives money and then communicates with a broker in the country receiving the transfer. The broker in the receiving country then pays out an equivalent amount (deducting for fees) to the recipient in the appropriate currency. Hawala transactions are discreet. They typically involve minimal

record-keeping, are not subject to government regulation and are premised on trust.

Hawala is widely used in communities that have limited access to formal banking structures and, for example, is an important vehicle for remittance payments from immigrants to family members in their home countries. But because of its informality, lack of record keeping and government oversight, hawala may be used to transfer illegally derived funds, as was the case here.

The government's proof established that the network in which Singh was involved transferred, over a considerable period of time, large sums of Canadian dollars from Pindi's Canadian drug operation to Los Angeles. Isshpunani worked with a broad network of hawala brokers, based in California and in India, to orchestrate the delivery of funds which had been sent to California to the Mexican cartel.

In spring of 2012, Singh was recruited into the operation by his uncle, Sucha Singh, who ran a hawala business. Initially, Singh worked for his uncle but later worked independently. Singh's primary responsibility was collecting and distributing money to Pindi's associates. The government's proof at trial established that Singh knew the funds were drug proceeds. Sanjiv "Bobby" Wadhwa, a co-defendant who later became a government witness, testified at trial that he told Singh that the funds Singh moved were drug proceeds.

Singh was a hard worker. In 2012, he completed 10–15 deliveries for Isshpunani of sums ranging from $100,000 to about $800,000. He received $250 for each $100,000 delivered. Singh also worked directly with Wadhwa, ultimately completing 30–40 money collections of amounts

ranging from $50,000 to $150,000 between April and October 2012.

These transactions were clothed in secrecy and a number of steps, above and beyond those routinely used in hawala transactions, were taken to hide the nature of the transactions. Singh switched out his SIM card and phone number every 20 to 25 days. Members of the conspiracy used burner phones—disposable, prepaid, effectively untraceable devices to communicate among themselves. Transfers involved code words such as "shaman" and "merchandise" to disguise the nature of the transactions. The hawala merchants used serial numbers on dollar bills to verify that the person who received the cash was the intended recipient. Higher than usual fees were charged.

The government's proof at trial included video surveillance records that showed Singh making deliveries on a number of occasions as well as Singh's own ledger which documented his activities and included cash amounts, recipients, and serial numbers. Finally, the government adduced evidence that Singh was stopped in October 2012 by a California Highway Patrol officer and told the officer that bags found in the car carried his wife's shoes, but the bags actually contained cash that he was on his way to deliver. After discovering the bags, the officer arrested Singh. After the arrest, law enforcement officers searched his home and seized large sums of cash as well as drug ledgers.

In addition to arguing that this evidence was insufficient to establish his guilt on the three counts on which he was convicted, Singh argues that two errors by the trial court require reversal. As noted, Sanjiv "Bobby" Wadhwa testified for the government at trial as a cooperating witness. At some point, defense counsel received information that the

FBI had investigated him based on an allegation that he had planned to murder Taran Singh, another hawala dealer. Both were alleged to be members of the conspiracy. The FBI ultimately concluded that the allegation was unsubstantiated and closed the case. At trial, defense counsel attempted to cross-examine Wadhwa regarding his involvement in the murder-for-hire plot, arguing that the evidence was relevant to his credibility. Defense counsel also sought to have recordings of Wadhwa speaking about the murder-for-hire plans, including discussing a $30,000 payment, admitted into evidence to refresh his recollection.

The court ruled that defense could inquire into whether Wadhwa was involved in the murder-for-hire scheme but that, citing Fed. R. Evid. 608(b), if Wadhwa denied his involvement, the inquiry must end, and extrinsic evidence could not be admitted to impeach him. When questioned, Wadhwa disavowed any involvement in a murder-for-hire scheme. The court explained that it limited cross-examination in order to "prevent impeachment of [him] on a collateral matter and to avoid a mini-trial on the issue of the murder-for-hire plot[.]" The court also excluded the recordings. Singh contends that these limitations violated the Confrontation Clause, U.S. Const. amend. VI.

Next, Singh contends that he is entitled to reversal because at trial the court permitted a constructive amendment of the indictment. Singh contends that the indictment charged only "a single, joint money transmitting business consisting of the entire hawala network and the various transactions . . . within it." At trial, however, the government offered proof and argued to the jury that Singh operated a money transmitting business. This variance, he contends, violated the Fifth Amendment, U.S. Const. amend. V.

Following Singh's conviction, the Probation Office calculated an offense level of 34. The components were a base offense level of eight, an 18-level enhancement because the amount of laundered funds was between $3.5 and $9.5 million, a six-level enhancement because Singh knew or believed the funds were related to drug trafficking and a two-level enhancement because Singh was convicted under 18 U.S.C. § 1956. Based on a Criminal History Category of I, these calculations yielded an advisory Guidelines range of 151–188 months. At sentencing, Singh objected to the six-level enhancement, contending that there was a lack of clear and convincing proof that he knew the funds were derived from drugs. The court disagreed but sentenced him well below his Guidelines range to 70 months. This appeal followed. For the reasons that follow, we affirm.

## DISCUSSION

## I

Singh's main arguments are that the government adduced insufficient evidence of a purpose to conceal, as required by 18 U.S.C. § 1956(a)(1)(B)(i), to support his conviction for concealment money laundering under Count I, and insufficient evidence of public involvement to support his convictions for operating and conspiring to operate a money transmitting business under Counts II and III, *see* 18 U.S.C. § 1960(b)(2). When evaluating a sufficiency challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Long v. Johnson*, 736 F.3d 891, 895–56 (9th Cir. 2013). We review sufficiency of evidence challenges *de novo*. *See United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019).

As noted, Singh was convicted of conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (Count I). The substantive elements of that offense are: "(1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (internal quotations and citations omitted). On appeal, Singh only challenges the sufficiency of the Government's proof on the 4th element.

On this element, Singh argues there was insufficient evidence that the transactions he participated in were designed to conceal illicit drug money. His support for this contention is *Regalado Cuellar v. United States*, 553 U.S. 550 (2008). There, the Supreme Court held that a conviction under 18 U.S.C. § 1956(a)(2)(B)(i), the provision that criminalizes transportation money laundering and is analogous to the (a)(1) provision at issue in this case, required the government to establish that "the purpose—not merely the effect—of the transportation was to conceal or disguise a listed attribute." *Cuellar*, 553 U.S. at 566. In other words, that a transaction is structured to hide its source is not enough. The government must prove that the transaction had the purpose of concealing the source. *Id*. at 566 (explaining "*how* one moves the money is distinct from *why* one moves the money.").

Cuellar was a drug courier—a "mule"—who was arrested after law enforcement officers discovered him transporting $81,000 of drug proceeds to Mexico. They were

covered in plastic bags and animal hair and hidden in a secret compartment in his car. *Cuellar*, 553 U.S. at 552. The Court held that although petitioner hid the proceeds to transport them, the evidence showed that his ultimate purpose was to "compensate the Mexican leaders of the operation," not to conceal the funds. *Id*. In other words, according to the Court, Petitioner's conduct was not designed to conceal an attribute of the funds but simply to move them. For this reason, the Court found the evidence insufficient and reversed the conviction.

Singh argues that *Cuellar* requires reversal of his conviction because the government adduced insufficient evidence that the hawala transactions in which he participated had a concealment purpose. The purpose, according to him, was simply to pay Mexican drug suppliers. In other words, Singh believes he and *Cuellar* were similarly situated.

We are not persuaded. The money laundering statute is violated if the transaction in question is "designed in whole *or in part*" to conceal. 18 U.S.C. § 1956(a)(1)(B)(i) (emphasis added). In *Cuellar*, the government proved that the effect of the transportation was payment of the Mexican drug suppliers, but there was no proof, or at least no sufficient proof, of a concealment purpose.

We conclude, for a host of reasons, that the transactions in question had (certainly in part) a concealment purpose. First, Singh and his co-conspirators used the hawala system. They could, theoretically, have saved themselves a good deal of time and effort by using wire transfers or mailing checks: procedures used countless times everywhere every day to move funds quickly and efficiently. Instead of doing so, they used a private system that involved informality, confidentiality, and intricate pickup and delivery procedures

with person-to-person contact to move very large sums of money. This system featured minimal record keeping and no governmental regulation, oversight or reporting requirements. While hawala is a system with legitimate users and an ostensibly legitimate purpose, a jury could have reasonably concluded from this evidence that Singh used it for the purpose of concealing the location and ownership of drug money.

Moreover, Singh did not simply use a basic hawala system. He used a stepped up system that included a number of concealment enhancing add-ons. He and his associates used coded words for drug money ("saman", "merchandise") to facilitate cash pick-ups and drop offs. Instead of using an iPhone or an Android, he used burner phones which he changed every 20 to 25 days. Burner phones obviously have legitimate uses. But they are often used in connection with drug transactions because there are no readily retrievable records of who owns them, calls are difficult to trace and it is considerably more difficult for law enforcement to get wire-tap authorizations for them. He also used serial numbers on currency, which were used to verify the identity of the courier receiving funds. When cash was delivered, the receiving courier was required to provide a serial number as verification. Moreover, the hawala system Singh used charged premium fees to move the Canadian money. Finally, when Singh was arrested, he falsely stated that a bag in his car that contained large amounts of drug proceeds held his wife's shoes. Based on this constellation of facts, a jury could have reasonably concluded that Singh intended to conceal the ownership and control of drug proceeds.

In *United States v. Wilkes*, the defendant was convicted of concealment money laundering under § 1956(a)(1)(B)(i) for payments and gifts to a California congressman in

exchange for government contracts. 662 F.3d 524, 530 (9th Cir. 2011). Wilkes transferred a $525,000 mortgage payment to the congressman in exchange for a contract; instead of transmitting the funds directly, Wilkes conducted a series of transfers, moving the money between different bank accounts. We concluded that the transactions, "which provided additional buffers between the corrupt contract and the payoff of [the congressman's] mortgage" were intended to conceal the source of the funds because, as here, they were "convoluted" and not "simple transactions," which were intended to mask the link between the funds and their source. *Id*. at 547.

Decisions from other courts reinforce our conclusion. In *United States v. Brown*, 553 F.3d 786, 787 (5th Cir. 2008), the Fifth Circuit found a concealment purpose where "the defendants intended to and did make it more difficult for the government to trace and demonstrate the nature of [] funds[,] . . . the transactions were in cash [and] [m]ost deposits were below ten thousand dollars" to dodge reporting regulations.[2] In *Magluta v. United States*, 660 Fed. App'x 803, 807–08 (11th Cir. 2016), the Eleventh Circuit found a concealment

---

[2] *Accord United States v. Diaz*, 2008 WL 4387209, *1 (S.D.N.Y. 2008) (finding a concealment purpose from a "sophisticated and complex financial scheme" that moved drug funds from New York to the Dominican Republic); *United States v. Spencer*, 2008 WL 4104693, *4 (D. Minn. 2008) (concluding that "mak[ing] it harder to trace the source of [] money" suggests a concealment purpose); *but see United States v. Garcia*; 587 F.3d 509 (2d Cir. 2009) (declining to find a concealment purpose where defendant secretly transported $2.2 million in drug proceeds across the U.S.); *United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (finding no concealment purpose where defendant transported millions of dollars in drug proceeds abroad because there was only "an intent to conceal the transportation, not an intent to transport in order to conceal.").

purpose where checks (derived from drug funds) given to criminal defense lawyers had false payees and the funds themselves were moved from "Miami to New York to Israel and then back to Miami." In sum, we conclude that the Government adduced sufficient evidence of Singh's concealment purpose.

## II

Next, Singh argues that the evidence introduced by the Government was insufficient to support his conviction under 18 U.S.C. § 1960, which bars the operation of an unlicensed money transmitting business. "Money transmitting" under § 1960(b)(2) "includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad[.]"

"A money transmitting business receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates[.]" *United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999). That is precisely what Singh did. The government's proof at trial established that Singh's conduct fit this definition.

Singh contends that "on behalf of the public" is an essential element of § 1960 which the government failed to prove beyond a reasonable doubt. The reasoning behind this, Singh maintains, is that "includes" in the statute's text should be understood as signifying "means." We disagree. We believe that "includes" deems what follows to be read as

a non-exhaustive list of what the statute covers.[3] Thus, we hold that "on behalf of the public" is not a necessary element of § 1960.

To address what constitutes "on behalf of the public:" we believe that for money transmission to be conducted "on behalf of the public" under § 1960, it must occur within a transactional, business dealing or for a member of the broader community rather than within a personal or close relationship. *See, e.g.*, *United States v. $215,587.22 in U.S. Currency*, 306 F. Supp. 3d 213, 218 (D.D.C. 2018) (defining "on behalf of the public" as a money transmission that is "made for third-parties or customers as part of a commercial or business relationship, instead of with one's own money or for family or personal acquaintances."). That is what occurred here.

Singh argues that because he did not advertise his services or make them generally available to everyone, his transactions were not "on behalf of the public." We disagree. We find it highly unlikely—indeed inconceivable—that Congress intended to limit § 1960 to money transferring businesses that used TV commercials, business cards or billboards. For these reasons, we conclude that Singh's conduct triggered liability under § 1960.

However, even if "on behalf of the public" were an element—which it is not—the government proved it. Given the numerosity, scale, and frequency of Singh's transactions, a jury could reasonably have concluded that his conduct was what Congress intended to proscribe and what the statute in

---

[3] *Cf. United States. v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) (interpreting the statutory definition of "includes" as "non-exhaustive rather than exclusive.").

fact proscribes. Singh, after all, was not a small-time hawala courier who limited his dealings to a small circle of family and friends: he was involved in dozens and dozens of transactions. For example, he picked up hundreds of thousands of dollars from Taran on 30–35 occasions, and he made 10–15 deliveries on Isshpunani's behalf in amounts between $100,000 and $800,000. He also transacted with various parties in parking lots, apartment complexes, warehouses, electronics stores and elsewhere. These activities were extensive, involving many people and lots of money. Drawing all inferences in the government's favor, it was reasonable for the jury to conclude that Singh was operating a sufficiently publicly oriented money transmitting business to fall under § 1960. *See* S. Rep. No. 101-460, at 14 (1990), reprinted in 1990 U.S.C.C.A.N. 6645, 6658–59; *United States v. $215,587.22 in U.S. Currency*, 306 F. Supp. 3d 213, 218 (D.D.C. 2018); *see also United States v. Banki*, 685 F.3d 99, 114 (2d Cir. 2012) (defining "business" under § 1960 as "an enterprise that is carried on for profit or financial gain"). In sum, the government adduced sufficient evidence to support Singh's convictions under § 1960 (Counts II and III).

### III

Next, Singh argues that the government's closing arguments constructively amended Counts II and III of the indictment. He contends that the indictment charged a "single, joint money transmitting business consisting of the entire hawala network and the various transactions . . . within it," but the government argued at trial that he operated a money transmitting business of his own. Because Singh

failed to object at trial, we review for plain error.[4] We see none.

A constructive amendment is an alteration to the indictment's terms "either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *Id*. at 1182–83. We have identified two kinds of constructive amendments: (1) those involving a "complex of facts presented at trial distinctly different from those set forth in the charging instrument" and (2) those where "the crime charged in the indictment was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Davis*, 854 F.3d 601, 603 (9th Cir. 2017). Neither occurred here.

The facts the government presented at trial were not "distinctly different" from those in the indictment. The government's proof established that the hawala network in which Singh operated was an extensive one involving many brokers and many transactions. Initially, Singh worked for his uncle but, as time went on, he worked independently. Further, the government's trial arguments did not substantially alter the indictment. Both the indictment and the government's proof at trial were directed at the same offense: operating an unlicensed money transmitting business. Whether he shared income with his uncle or kept it for himself is of no moment. He was still operating an

---

[4] Plain error occurs "if there has been (1) error; (2) that was plain; (3) that affected substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Mickey*, 897 F.3d 1173, 1183 (9th Cir. 2018).

unlicensed business. Thus, we see no error and certainly no plain error.

Singh seeks support from *Stirone v. United States*, 361 U.S. 212, 217 (1960) and *United States v. Ward*, 747 F.3d 1184, 1192 (9th Cir. 2014), both cases where the courts found a constructive amendment. In *Stirone*, the Supreme Court found a constructive amendment when the indictment charged the defendant with unlawful interference with the interstate movement of sand, while the trial court's instruction allowed the jury to convict for either unlawful sand or steel shipments. The Court held that the indictment could not "fairly be read" as containing the same charge as the conviction. *Stirone*, 361 U.S. at 217. In *Ward*, this court found a constructive amendment where there was ambiguity around whether identity theft convictions were based on the indictment's charge or "uncharged conduct." 747 F.3d at 1191. In that case, the jury may have convicted the defendant for aggravated identity theft against victims who were not specified in the indictment. A constructive amendment occurred because, since "the identity of the victims was necessary to satisfy an element of the offense," the conviction was not unequivocally based on the indictment's charged conduct. *Id*. at 1192.

In contrast to these cases, the indictment charges that Singh worked with others in a money transmitting business based on the hawala network, which is not "distinctly different" from charging Singh with conducting his own money transmitting business and did not "substantially alter" the charges Singh faced.

## IV

Next, Singh argues that the trial court violated the Confrontation Clause by limiting the cross-examination of

Sanjiv "Bobby" Wadhwa, who testified at trial as a cooperating witness. At some point, defense counsel received information that the FBI had investigated Wadhwa based on an allegation that he had planned to murder Taran Singh, another hawala dealer. Both were alleged to be members of the conspiracy. The FBI ultimately concluded that the allegation was unsubstantiated and closed the case. At trial, defense counsel attempted to cross-examine Wadhwa regarding his involvement in the murder-for-hire plot, arguing that the evidence was relevant to his credibility. Defense counsel also sought to have recordings of Wadhwa speaking about the murder-for-hire plans, including discussing a $30,000 payment, admitted into evidence to refresh his recollection.

The district court ruled that defense could inquire into whether Wadhwa was involved in the murder-for-hire scheme; but, citing Rule 608(b), if Wadhwa denied his involvement, the inquiry would need to end and extrinsic evidence could not be admitted to impeach him. When questioned, Wadhwa disavowed any involvement in a murder-for-hire scheme. The court explained that it limited cross-examination in order to "prevent impeachment of [him] on a collateral matter and to avoid a mini-trial on the issue of the murder-for-hire plot[.]" The court also excluded the recordings. Singh contends that these limitations violated the Confrontation Clause, U.S. Const. amend. VI. This court reviews Confrontation Clause-based challenges to a district court's limitations on cross-examination *de novo*. *See United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007). However, this court will review "[a] challenge to a trial court's restrictions on the manner or scope of cross-examination on non-constitutional grounds" for an abuse of discretion. *Id.*

The Confrontation Clause secures a defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Clause also guarantees "the right of effective cross-examination." *Larson*, 495 F.3d at 1102. However, the right to cross-examine is subject to very well-established limitations that permeate the Federal Rules of Evidence. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues. . . or interrogation that is. . . only marginally relevant." *Id*. at 1101 (citation omitted).

At trial, Singh made extensive use of his right to "confront" Wadhwa. Wadhwa testified for approximately two and a half hours, and he was cross-examined extensively about meeting with his cellmate's wife and one of her associates and about whether, during that meeting, he agreed to have Taran killed in exchange for a payment of $30,000. The court below imposed limitations on cross-examination, invoking Rules 608(b) and 403, but there are precious few federal criminal trials in which limitations of one kind or another on cross-examination are not imposed.

*United States v. Mikhel*, 889 F.3d 1003, 1048 (9th Cir. 2018), is our test for when restrictions on cross-examination become sufficiently extensive to raise Confrontation Clause concerns that may undermine the fairness of a trial. Under *Mikhel*, the inquiry is "(1) whether the excluded evidence was relevant; (2) whether there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3) whether the exclusion of evidence left the jury with sufficient information to assess the witness's credibility." *Id*. (citing *Larson*, 495 F.3d at 1103).

Here, the relevance of the additional questioning Singh's counsel wished to pursue—about recordings of meetings between Wadhwa and his cellmate and the cellmate's wife related to the murder-for-hire—was, as the district court ruled, highly attenuated and convoluted. The line of examination defense counsel wished to pursue "becomes a he-said/he-said/he-said and then she-said/he-said . . . [i]t's confusing because there's a lot of different versions." Moreover, the trial judge concluded that the line of cross-examination in question was not sufficiently relevant to any potential bias Wadhwa might harbor because it involved events that were simply too peripheral.

Under *Mikhel*'s second prong, it was well within the trial judge's discretion to limit cross-examination to prevent "a trial-within-a-trial." 889 F.3d at 1048. The trial judge did just that, explaining "[w]e are not here to try Mr. Wadhwa for a plot to murder another witness. It is collateral . . . we are not trying the murder for hire case. We are trying the hawala money laundering case."

Lastly, the exclusion in question certainly left the jury with enough evidence to assess Wadhwa's credibility. The jury already knew that Wadhwa had pleaded guilty, that the government first approached him about testifying against Singh while Wadhwa was in prison after sentencing, and that Wadhwa was seeking a lower sentence. Moreover, the trial judge did not completely exclude any inquiry about the murder-for-hire plot. He permitted a question as to whether Wadhwa had been involved in the scheme. Wadhwa denied his involvement, and under Rule 608(b), the trial court acted well within its discretion in ending the matter there. The court also invoked Rule 403: "I'm not going to have a trial on whether there was, in fact, a murder-for-hire plot and all the meetings he may have had to effectuate those things

because I think that they are collateral, time-consuming, and unfairly prejudicial, and they're going to divert the jury from this case." Later, when denying defendant's motion for a new trial, the judge elaborated: "the probative value of Wadhwa's involvement in a murder-for-hire plot was substantially outweighed by the danger of confusing the issues before the jury and wasting time with a mini-trial [especially considering] that the murder-for-hire allegations against Wadhwa were found to be unsubstantiated." We see no Confrontation Clause violation and no abuse of discretion in these rulings.

## V

Finally, Singh challenges the district court's application of a six-level sentencing enhancement under USSG § 2S1.1(b)(1) because Singh knew that the laundered funds were drug trafficking proceeds. Under Count I, the government was required to prove, and did prove, that the funds in question were derived from illegal activity but was not required to prove that the funds were drug proceeds. The parties disagree over the proper standard of proof the district court should have applied to establish the facts supporting the enhancement. Singh, relying on *United States v. Staten*, 466 F.3d 708 (9th Cir. 2006), argues that a clear and convincing evidence standard should apply because the application of the enhancement produces a disproportionate impact on the sentence compared to the offense of conviction. The government argues that the preponderance of the evidence standard should apply. It reasons that once the Guidelines became permissive, and not mandatory, the binary approach to uncharged enhancements under *Staten* was no longer appropriate and that this case should become the vehicle for the Circuit to revisit the decision.

We are not required to resolve this issue because the record supports the application of the enhancement under either standard of proof. The government's proof at trial that the funds were derived from drug trafficking and that Singh knew that source was overwhelming. The entirety of Singh's seven-day trial centered around drug money. In fact, the government's only theory of illegality was that the funds were the proceeds of drug trafficking. Moreover, the government proved Singh knew the funds were drug proceeds. Wadhwa testified that he told Singh that the hawala money was from "davai" or drugs. Sucha also made statements during a telephone call that was introduced into evidence that strongly suggest Singh knew about the funds were related to drug trafficking. On the strength of this record, the district court concluded—quite correctly in our view—that there was "substantial evidence that defendant knew that the proceeds and the laundered funds were connected to drug activity."

Finally, we note the district court ultimately imposed a sentence of 70 months, which is well below Singh's Guidelines range of 151–188 months. For these reasons, we see no merit to Singh's challenge to his sentence.[5]

---

[5] Moreover, even under this court's disproportionate impact test in *United States v. Gonzalez*, the clear and convincing evidence standard would not apply. 492 F.3d 1031, 1039 (9th Cir. 2007); *see also United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001); *United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001). *Gonzalez* lists the six factors that comprise the disproportionate impact test: "1. Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment? 2. Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment? 3. Do the facts offered in support of the enhancement create new offenses requiring separate punishment? 4. Is the increase in

**CONCLUSION**

The judgment of the District Court is **AFFIRMED**.

WATFORD, Circuit Judge, concurring in part and dissenting in part:

Harinder Singh helped transfer drug proceeds from a drug trafficker in Canada to drug suppliers in Los Angeles. I agree with my colleagues that this conduct rendered Singh guilty of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. In my view, however, Singh's conduct did not amount to participation in a money laundering conspiracy. I therefore join Parts II through IV of the majority opinion but am unable to join Parts I and V.

I will be the first to concede that, on the surface, using a hawala network to transfer hundreds of thousands of dollars

---

sentence based on the extent of a conspiracy? 5. Is the increase in the number of offense levels less than or equal to four? 6. Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?" The enhanced sentence of 151–188 months falls within the maximum sentence (20 years) and the enhanced sentence does not negate the presumption of innocence or the government's burden of proof. Moreover, the enhancement facts do not create a new offense and the sentence increase is not derived from the extent of a conspiracy. While the offense level increase (six) is greater than four and the enhanced sentence length (151 to 188 months) more than doubles the length based on the initial guidelines range (78 to 97 months), these factors, considered in the aggregate, do not require application of a clear and convincing evidence standard.

in drug proceeds from Canada to Los Angeles certainly *seems* like it should violate 18 U.S.C. § 1956(a)(1)(B)(i), the statutory provision at issue here. The provision prohibits engaging in a "financial transaction" involving the proceeds of unlawful activity "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." Using a hawala network to transfer money undoubtedly qualifies as a "financial transaction" as that term is defined. § 1956(c)(3)–(4). In addition, transfers through a hawala network unquestionably have the *effect* of concealing the flow of money; they are far less transparent from law enforcement's perspective than, say, wire transfers through a bank. While hawala brokers may keep informal ledgers recording the senders, recipients, and amounts transferred, they do not maintain the kind of detailed transactional records that banks and other financial institutions must. And it's a safe bet that hawala brokers do not alert the government to suspicious transactions involving large amounts of cash, as banks and other financial institutions are required to do.

But does that mean anyone who uses a hawala network to transfer illicit funds from point A to point B is guilty of money laundering? The Supreme Court's decision in *Regalado Cuellar v. United States*, 553 U.S. 550 (2008), suggests that the answer is no.

In *Cuellar*, the Court reviewed a defendant's conviction for transporting $81,000 in drug proceeds to Mexico. The conviction arose under a neighboring provision of the money laundering statute that prohibits transporting, transmitting, or transferring proceeds of unlawful activity into or out of the United States "knowing that such transportation, transmission, or transfer is designed in whole or in part . . .

to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(2)(B)(i). As one can see, this provision directly parallels the provision at issue in our case, § 1956(a)(1)(B)(i). Both prohibit engaging in conduct with proceeds of unlawful activity for any of the same forbidden purposes. One simply targets financial transactions involving illicit funds, while the other targets transporting, transmitting, or transferring such funds. Because the "designed . . . to conceal or disguise" clause of the two provisions is identically worded, lower courts have held that *Cuellar*'s holding applies with equal force to § 1956(a)(1)(B)(i). *See, e.g.*, *United States v. Brown*, 553 F.3d 768, 786 n.56 (5th Cir. 2008); *United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008).

The Court said two things in *Cuellar* that are of prime importance to the analysis in our case. First, the Court interpreted the statute's use of the term "design" to mean "purpose or plan; *i.e.*, the intended aim of the transportation." *Cuellar*, 553 U.S. at 563. Thus, a conviction under § 1956(a)(2)(B)(i) "requires proof that the purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute" of the funds. *Id.* at 567. The Court stressed the distinction between purpose and effect because in that case there was no question that the effect of the transportation was to make it harder for law enforcement to track the location and control of the funds. Rather than sending the money by wire transfer, the defendant tried to transport $81,000 in cash to Mexico in a Volkswagen Beetle. He went to considerable lengths to conceal the fact that he was transporting the money across the border. Officers found the cash hidden in a secret compartment beneath the car's rear floorboard, bundled in plastic bags and duct tape. Animal hair had been spread over

the secret compartment, presumably to mask the smell of marijuana emanating from the money.  And someone had taken steps to cover up the recent creation of the secret compartment.  *Id.* at 554.

Notwithstanding this evidence of a concealment *effect*, the Court reversed the defendant's conviction because the evidence did not establish a concealment *purpose*.  The government's expert testified that the purpose of transporting the cash to Mexico was to pay the leaders of the drug-trafficking organization located there.  *Id.* at 566 & n.7.  In other words, the "intended aim" of the transportation was simply to move the money from point A to point B.  The government did not prove that, in addition, the transportation was designed to conceal or disguise a listed attribute of the funds.  Such a purpose might have been shown if, for example, the defendant had transported the funds to Mexico so that they could be buried in the desert, thereby concealing their location from authorities.  *See id.* at 558–59, 565.

Second, the Court drew a distinction between proof concerning *how* the funds were transported and proof concerning *why* they were transported.  The concealment evidence the government offered related to "the manner in which [the transportation] was carried out."  *Id.* at 564.  The Court noted that the elaborate steps the defendant took to conceal his transportation of the funds could serve as circumstantial evidence that transporting the cash was designed in part to conceal a listed attribute of the funds.  But, the Court held, evidence concerning *how* the defendant moved the money was not sufficient on its own to prove *why* he moved the money.  *Id.* at 566.  As far as the government's evidence showed, the "why" was simply to pay the leaders of the drug-trafficking organization in Mexico, nothing more.

The government's evidence in our case suffers from the same deficiencies the Court identified in *Cuellar*. To be sure, the government proved that the financial transactions at issue—transferring the funds through a hawala network rather than by wire transfer or check—had the effect of making it harder for law enforcement to track the location and control of the funds. But just as in *Cuellar*, the government's proof did not establish that the "intended aim" of the hawala transfers was to conceal or disguise a listed attribute of the funds. *Id.* at 563. The government's expert in this case, too, testified that the purpose of the hawala transfers was simply to pay off debts owed to the drug suppliers in Los Angeles. In other words, just as in *Cuellar*, the government proved only that the intended aim of the financial transactions was to move drug proceeds from point A to point B.

The majority suggests that this case involves something more than using ordinary hawala transfers to move illicit funds from one location to another. It relies on evidence that the defendants tried to conceal the hawala transfers by using code words, burner phones, and serial numbers on the currency to verify the identity of the recipient—what the majority refers to as "concealment enhancing add-ons." Maj. op. at 12. But the use of code words, burner phones, and serial numbers during the hawala transactions is equivalent to the efforts to prevent detection of the funds during transportation that the Supreme Court found insufficient to prove purpose in *Cuellar*. 553 U.S. at 563, 566. The evidence cited by the majority relates to the manner in which the hawala transfers were carried out, not *why* they were carried out. As noted, when the government's expert addressed the "why" question, he testified that the purpose of the hawala transfers was to pay debts owed to the leaders of the drug-trafficking organization in Los Angeles.

The government introduced no other evidence concerning the purpose of the transfers, so Singh's conviction cannot be saved by resorting to the statute's "designed in whole or in part" language.

The majority states that our decision in *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011), and cases from other courts support its conclusion that these transactions evince a concealment purpose, even under *Cuellar*. But our case lacks what was critical in each of those other cases: evidence of unnecessarily complex transactions. In *Wilkes*, for example, the defendant moved funds intended as a bribe through a series of "convoluted" transactions rather than transmitting the money directly to the recipient of the bribe. *Id.* at 547. Because the transactions between various accounts were unnecessary, the evidence supported the conclusion that the "dominant, if not the only, purpose" of these transactions was to conceal the source and ownership of the money. *Id.* Here, by contrast, there is no evidence that the defendants carried out superfluous transactions or that any of the transactions were intended to create a buffer between the source and recipient of the funds.

Nor did the funds in our case travel a circuitous route to their destination, as in *Magluta v. United States*, 660 F. App'x 803 (11th Cir. 2016). In *Magluta*, the defendant transferred funds from Miami to New York to Israel; deposited cash in a bank account in Israel under a false name; and then issued checks from that sham account to pay his lawyers back in Miami. *Id.* at 807. The court held that this evidence "would permit the jury to infer that Magluta's intent in paying his attorneys was at least in part to cover up the fact that the payments derived from Magluta's drug proceeds." *Id.* at 808. Here, the defendants moved money directly from the drug trafficker in Canada to the drug

suppliers in Los Angeles.   They did not engage in unnecessarily convoluted transactions from which one could infer an intent to conceal a listed attribute of the funds.

The facts of our case are far more similar to those in *United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009).  There, the Second Circuit reversed a defendant's conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).   The financial transaction at issue involved transferring $2.2 million in cash by truck from the East Coast to California or Texas to pay a debt owed to the drug supplier.   The defendant was the truck driver hired to make the trip.  Relying on *Cuellar*, the court found insufficient proof that a purpose of the transaction was to conceal a listed attribute of the funds.   587 F.3d at 518–19.  The court rejected the government's argument that such a purpose could be inferred from the chosen method of transfer (one that left no paper trail) and the steps taken by the defendant to conceal the transaction from the authorities. "At bottom," the court concluded, "the purpose of the transaction here, as in *Cuellar*, was merely to pay for narcotics."   *Id.* at 519; *see also United States v. Ness*, 565 F.3d 73, 76–78 (2d Cir. 2009).

I would reach the same conclusion in this case.  Because the government failed to prove that the hawala transfers were designed to conceal or disguise a listed attribute of the funds, Singh's conviction for conspiracy to commit money laundering should be reversed.